RELIANCE GROUP HOLDINGS, INC., et al., Respondents-Appellants, v NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., et al., Appellants-Respondents.

First Department, March 2, 1993

## APPEARANCES OF COUNSEL

*Eric J. Lobenfeld* of counsel *(Gregory P. Candela* with him on the brief; *Eric J. Lobenfeld* and *Andrew B. Donnellan, Jr.,* attorneys), for respondents-appellants.

*Robert E. Kushner* of counsel *(Kenneth A. Sagat, Andrew R. Simmonds* and *Jeffrey J. Diecidue* with him on the brief; *D'Amato & Lynch,* attorneys), for National Union Fire Insurance Company of Pittsburgh, Pa., appellant-respondent.

*Michael L. Anania* of counsel *(Victor G. Gleser, Patrick J. Sullivan* and *Raquel S. Colby* with him on the brief; *Ford Marrin Esposito Witmeyer & Gleser,* attorneys), for Continental Casualty Company, appellant-respondent.

## OPINION OF THE COURT

CARRO, J.

Plaintiff Saul Steinberg is a director and the CEO of plaintiff Reliance Group Holdings, Inc., and together with his family members owns 100% of Reliance's stock. In 1982, Reliance obtained directors and officers (D&O) liability and indemnity insurance under three separate policies—a primary policy issued by defendant National Union insuring losses to Reliance of up to $20 million arising out of claims against its directors and officers, an excess policy issued by defendant Continental Casualty (also known as CNA) for losses between $20 million and $30 million, and a further excess policy issued by National Union for losses between $30 million and $40 million.

In early 1984 Reliance, acting through its corporate subsidiaries, began a hostile takeover of Walt Disney Productions, Inc. by purchasing in the open market 4,198,233 shares of Disney common stock, representing 12.2% of the outstanding

shares, at an average $63.25 per share or a combined price of $265.5 million. Steinberg himself made none of these purchases. Reliance also announced that it might seek up to 5,467,000 additional Disney shares. Disney's management responded to the takeover attempt by taking actions aimed at making Disney a less desirable acquisition, including taking on additional debt, proposing the acquisition of heavily indebted companies and giving Disney management "golden parachutes."

Reliance Insurance, the subsidiary that had purchased most of the Disney stock, filed a shareholder's derivative action against Disney and its board of directors to block Disney from consummating these defensive actions. On May 19, 1984 Reliance announced that it would proceed with a proxy contest to gain control of Disney, and on June 8 Reliance announced a tender offer of $67.50 per share for an additional 37.9% of Disney's outstanding stock.

On June 11, 1984, to end Reliance's takeover efforts, Disney agreed to purchase Reliance's entire Disney holdings at the inflated price of $77.50 per share (which was selling in the open market for $54.25 per share) for a total price of $325.4 million, which included reimbursement by Disney of Reliance's claimed expenses in pursuing the tender offer. Reliance in turn agreed to withdraw its tender offer and not to oppose dismissal of the shareholder's derivative suit it had commenced, and Reliance and certain other parties, including Mr. Steinberg, agreed to make no further attempt to take over Disney for a period of 10 years.

"Greenmail" has been defined as follows: "A greenmailer creates the threat of a corporate takeover by purchasing a significant amount of the company's stock. He then sells the shares back to the company when its executives, in fear of their jobs, agree to buy him out." (Heckmann v Ahmanson, 168 Cal App 3d 119, 123, n 1, 214 Cal Rptr 177, 180, n 1.) Between June 11 and July 1, 1984, a series of class action and shareholder's derivative suits were filed against Reliance and others, including Mr. Steinberg. The shareholder class and derivative actions filed in California State court were consolidated into an action entitled Heckmann v Ahmanson, which essentially claimed a breach of fiduciary duties to Disney shareholders in that the Reliance defendants (Reliance and seven of its subsidiaries) had allegedly abandoned the derivative action against the Disney directors in exchange for a payment of greenmail.

The Superior Court, Los Angeles County, entered a preliminary injunction against the Reliance defendants (hereafter Reliance), effectively imposing a constructive trust on Reliance's profit from the transaction and requiring Reliance to account for the proceeds. The California Court of Appeal affirmed the order granting a preliminary injunction. *(Heckmann v Ahmanson, supra.)* Notably, Reliance argued on the California appeal that even if plaintiffs therein were to prevail, "they would not be entitled to a constructive trust because they have an adequate remedy at law in the form of money damages." *(Supra,* 168 Cal App 3d, at 133, 214 Cal Rptr, at 187.) The California Court of Appeal disagreed, observing that "[i]n California, as in most jurisdictions, an action in equity to establish a constructive trust does not depend on the absence of an adequate legal remedy * * * A constructive trust is '[the] usual theory' upon which a plaintiff *recovers wrongfully acquired assets.* Only where the constructive trustee has dissipated the fund that would constitute the res of the constructive trust is it proper to award a judgment for money damages." *(Supra,* 168 Cal App 3d, at 134, 214 Cal Rptr, at 187 [emphasis added].)

The California court went on to hold that plaintiffs had shown a reasonable probability of success on their claims, and upheld the temporary imposition of a constructive trust upon Reliance's greenmail profits: "The purpose of the constructive trust remedy is to prevent unjust enrichment and to prevent a person from taking advantage of his own wrong * * * Thus, under a constructive trust upon money, the plaintiff is entitled to trace the fund to its ultimate product or profit * * * By the time plaintiff obtains a final judgment, the original fund may have grown far greater than the legal rate of interest would recognize. To allow the defendant to pocket the difference would reward the defendant for his own wrongdoing." *(Heckmann v Ahmanson, supra,* 168 Cal App 3d, at 134, 214 Cal Rptr, at 188.)

The greenmail profit frozen by the preliminary injunction amounted to over $60 million, representing the difference between the amount Reliance paid for its Disney shares and the sale back to Disney, plus the income earned on that amount from the date of receipt. *Heckmann* went to trial in Los Angeles in June 1989. On July 10, 1989 a settlement was reached for an aggregate amount of $45 million. Of that amount, Reliance and Steinberg agreed to pay $20.8 million plus interest, for a total payment of approximately $21.1

million. At the time of the settlement, the fund representing Reliance's greenmail profits had grown from $60 million to over $94 million.

On August 8, 1989, Reliance's board of directors ratified the *Heckmann* settlement and adopted a resolution indemnifying Steinberg for that portion of the defense costs and the settlement attributable to him. However, the settling agreements for the *Heckmann* class action and derivative action were drawn in such a way as to obscure who was liable for what amounts, and simply recited that certain amounts would be paid by the "settling defendants" who had agreed to contribute.

In October of 1989 Reliance and Steinberg brought the instant action seeking payment under the National Union and CNA D&O policies of the entire *Heckmann* settlement and the entire defense expenses of the *Heckmann* action, allegedly about $5 million. CNA successfully moved to dismiss all claims against it except for a declaration of coverage under CNA's excess policy. In September of 1990 National Union moved for summary judgment dismissing plaintiffs' claims against it, and shortly thereafter CNA sought summary judgment on the claim for declaratory relief previously upheld on its motion to dismiss. Plaintiffs opposed the insurers' motions and cross-moved for summary judgment on their claims.

The IAS Court concluded that the essential inquiry was whether Reliance's settlement payments were made to indemnify Steinberg, in whole or in part, as an officer or director of the corporation. The court reasoned that although Steinberg bought no Disney stock in his name, he acted through Reliance which he controlled as its director and CEO, and not as a major stockholder, and thus he was technically covered by the D&O policies. Noting, however, that issues of fact existed regarding apportionment of the settlement and legal fees, the IAS Court denied summary judgment except to the limited extent of dismissing plaintiffs' claims for fraud and punitive damages. Defendants appealed from the order to the extent it denied their motions for summary judgment and plaintiffs cross-appealed insofar as the order partially granted National Union's motion and denied their cross motion.

National Union's D&O policy obligated it to "pay on behalf of [Reliance] loss (as hereinafter defined) arising from any claim or claims * * * made * * * against * * * Director[s] or Officer[s] of [Reliance], by reason of any Wrongful Act (as

hereinafter defined) in their respective capacities as Directors or Officers of [Reliance]." The policy defined "loss" as "any amount [Reliance] shall be required or permitted by law to pay to a Director or Officer as indemnity for a claim or claims against him * * * and shall include damages, judgments, settlements, costs, charges and expenses * * * incurred in the defense of actions * * * for which payment by [Reliance] may be required or permitted according to applicable law, common or statutory, or under provisions of [Reliance's] Charter or By-Laws effective pursuant to such law, provided always that such subject of loss shall not include fines or penalties imposed by law or other matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed." CNA's excess policy provides essentially identical coverage. Reliance's by-laws require Reliance to indemnify its directors and officers "against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred" by them in connection with actions brought against them.

"Wrongful Act" is defined in the policy as "any breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted by the Directors or Officers or any of the foregoing so alleged by any claimant or any matter claimed against them solely by reason of their being such Directors or Officers." While Continental argues that the phrase "solely by reason of their being such Directors or Officers" modifies each of the preceding clauses in the definition, the authorities have concluded otherwise. One commentator, for example, has noted that "Wrongful Act" is defined broadly, and that "[i]t would be hard to think of any act or omission by a director or officer, acting as such, which would not be covered by this definition. The reference to matters claimed against them 'solely by reason of their being' directors or officers is presumably intended to include cases where the directors and officers are sued merely because of their position rather than because of any specific conduct." (Johnston, *Corporate Indemnification and Liability Insurance for Directors and Officers,* 33 Bus Law 1993, 2017 [1978]; *see also, Continental Copper & Steel Indus. v Johnson,* 491 F Supp 360, 364 [SD NY 1980], *affd* 641 F2d 59 [2d Cir 1981]; Note, *Indemnification of the Corporate Insider: Directors' and Officers' Liability Insurance,* 54 Minn L Rev 667, 688 [1970]; Note, *Liability Insurance for Corporate Executives,* 80 Harv L Rev 648, 650-651 [1967].)

The central issue presented on this appeal is whether Reliance sustained a "loss" as defined in National Union's primary policy, and CNA's excess policy which incorporated by reference the terms, conditions and exclusions of the primary policy. National Union's policy divided "loss" into two categories. The first consists of "damages, judgments [and] settlements," which Reliance and Steinberg contend is referable to the $21.1 million paid in settlement of the *Heckmann* action, and the second consists of "costs, charges and expenses incurred in the defense" of an action. The only reasonable construction of "damages, judgments [and] settlements" as used in the policy requires, in order to constitute a covered "loss," that there must have been an ordered or actual payment of damages by the director or officer, either in satisfaction of a judgment, or by way of settlement of an action.

█ Reliance and Steinberg urge a construction of the policy that would cover *any* settlement, whether for damages, or for restitution of property wrongfully acquired.[1] The following hypothetical fact pattern illustrates the untenability of this argument. Assume that by embezzlement or fraud a corporation obtains title to stock worth $60 million. The rightful owner sues to impress a trust on the proceeds of the sale of the stock, and after the court imposes a temporary constructive trust the action is settled by a payment of $20 million, which would undoubtedly constitute partial restitution to the rightful owner. Under the construction urged by Reliance and Steinberg, if an officer or director was sued together with the corporation, the corporation could make full or partial restitution of the embezzled or fraudulently obtained funds purportedly on behalf of its officer, adopt a resolution indemnifying the officer, and then successfully make claim against its D&O insurer for the full amount of the settlement. Surely the corporation's disgorgement of such wrongfully acquired property would not be recognized as an insurable loss. The only meaningful difference between this hypothetical and the instant case is that the action for restitution herein alleged

---

1. "It is undisputable that the sums expended by Reliance on behalf of Mr. Steinberg, for which it seeks reimbursement in this action, were amounts paid to defend and settle the Disney-related actions. As such, they were 'settlements, costs, charges and expenses * * * incurred in the defense of actions' * * * for which Mr. Steinberg was properly indemnified pursuant to Delaware law and Reliance's By-Laws, and which therefore fall squarely within the definition of 'loss' in the D&O policies. That should end the inquiry." (Reliance brief in opposition to cross appeal of CNA, at 7.)

Reliance's breach of fiduciary duty owed to Disney by virtue of its having commenced the shareholder's derivative suit against Disney, which was abandoned by Reliance in exchange for the payment of greenmail *(see, Heckmann v Ahmanson, supra,* 168 Cal App 3d, at 128-131, 214 Cal Rptr, at 183-185).

"It is well established that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired. Such orders do not award 'damages' as that term is used in insurance policies [citations omitted]." *(Bank of W. v Superior Ct.,* 2 Cal 4th 1254, 1266, 833 P2d 545, 553 [Sup Ct 1992].) It will be recalled that the California Court of Appeal in *Heckmann v Ahmanson (supra)* affirmed the imposition of a temporary constructive trust on Reliance's greenmail profits of $60 million pending a final determination as to which parties were to be granted title to that fund, in whole or in part. "A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may arise because it was acquired through fraud, duress, undue influence or mistake, breach of fiduciary duty, or wrongful disposition of another's property." (5 Scott, Trusts § 404.2 [4th ed].)

The settlement of that action on July 10, 1989 was essentially equivalent to a determination, reached through agreement of the parties, that Reliance had been unjustly enriched in the amount of $21.1 million through its actions in connection with the Disney takeover attempt. In other words, determination of this appeal should not hinge on the circumstance that Reliance made restitution by way of settlement instead of in satisfaction of a judgment after trial. Upon payment of the $21.1 million, Reliance became entitled to have the remainder of the greenmail fund, which had in the interim increased to $94 million, released to it and its subsidiaries. Reliance did not pay or incur any "damages" on behalf of Steinberg, and there was accordingly no basis for his purported indemnification. Reliance sustained no "loss" as defined in the policy, but rather realized a profit of approximately $74 million in connection with its Disney takeover attempt after the *Heckmann* settlement. Even taking into account Reliance's settlement of two New York Federal actions arising out of the same transaction—*Kamerman v Steinberg* ($2.2 million) and *Brown v Steinberg* ($4.5 million)—Reliance was left with a profit of over $60 million.

■ The D&O policy covers corporate indemnification of directors and officers for *their* incurred liability, not the corporation's own liability. As pertinent to the $21.1 million claim, the insurers agreed to reimburse Reliance for amounts that Reliance paid to indemnify its directors and officers for damages incurred by them in an action based upon a wrongful act. The *Heckmann* action resulted in partial restitution or disgorgement by Reliance, of Reliance's greenmail profits which had been ordered held in a constructive trust for the benefit of the plaintiffs therein, rather than a payment of damages on Steinberg's behalf. It is patent from what transpired here that Mr. Steinberg incurred no damages liability for which he was indemnified by Reliance, and consequently Reliance incurred no loss as defined by the D&O policy.

*Wayne County Neighborhood Legal Servs. v National Union Fire Ins. Co.* (971 F2d 1 [6th Cir 1992]), relied upon by the plaintiffs, is distinguishable. In that case Rodney Watts, the former Executive Director of the insured, Wayne County Neighborhood Legal Services (Legal Services), brought a wrongful discharge action against Legal Services, its board of directors generally, and Avis Holmes, a member of the board. Watts claimed breach of contract, violations of State open meeting laws and the Whistleblower's Act, "and in allegations specifically directed at Holmes, intentional infliction of emotional distress and defamation of character." (971 F2d, *supra,* at 2.) The action was settled for $80,000 in an agreement providing that Holmes reserved the right to seek indemnity against Legal Services and National Union under Legal Services' D&O policy. The question whether Holmes was entitled to indemnification by Legal Services, and in what amount, was held not suitable for summary judgment *(supra,* at 4). Clearly, that action sought damages, not restitution as in the *Heckmann* action.

In contrast to the underlying action for damages in *Wayne County (supra),* the California Court of Appeal stated in *Heckmann v Ahmanson (supra,* 168 Cal App 3d, at 124, 214 Cal Rptr, at 181): "The gravamen of the action against the Steinberg Group is that it used its tender offer and the Arvida litigation to obtain a premium price for its shares in violation of its fiduciary duties to Disney and the other shareholders. The complaint seeks, among other things, rescission of Disney's repurchase agreement with the Steinberg Group, an accounting and a constructive trust upon all funds the Steinberg Group received from Disney." Steinberg himself made no

tender offer, did not buy or sell any Disney stock, made no profit whatever from any of the transactions, and had no interest personally or as a director or officer in the res upon which the constructive trust was imposed, and from which partial restitution was made.[2] No issue of fact is raised in the record as to any of these circumstances, which we find determinative. Accordingly, National Union and CNA's motion for summary judgment should have been granted with regard to the $21.1 million settlement of the *Heckmann* action.

With respect to Reliance's claim for reimbursement of that portion of the legal defense expenses attributable to Steinberg, we accord little significance to the circumstance that all legal bills were addressed to and paid by Reliance *(see, Wayne County Neighborhood Legal Servs. v National Union Fire Ins. Co.,* 971 F2d, *supra,* at 4, n 3). However, a realistic appraisal of the Heckmann v Ahmanson litigation and its resolution points compellingly to the conclusion that the expenses incurred in the defense of that action would have been the same whether Steinberg was or was not a named defendant. All of the acts attributable to the "Steinberg Group" were in fact acts of the Reliance corporate defendants, and Steinberg was merely identified in the *Heckmann* complaint as the individual "who controls and operates the Reliance Insurance entities named as defendants herein." Similarly, the financial consequences to the *Heckmann* plaintiffs arose solely from the acts of the Reliance corporate defendants. The Disney takeover attempt was purely a corporate venture involving Disney stock purchases only by the Reliance corporate defendants, which yielded an enormous corporate greenmail profit that was only partially disgorged by the corporate defendants. "Since the right to contribution is inherently equitable in nature, the rule logically follows that where co-obligors have received unequal benefits from the common obligation, the

---

**2.** If Steinberg *had* made a profit and returned part of it in settlement of the *Heckmann* action, and he had sought recovery under the "Directors and Officer[s] Liability" portion of the policy instead of the "Company Reimbursement" portion of the policy, his claim would almost certainly be excluded by a provision that states: "The insurer shall not be liable to make any payment in connection with any claim made against the [directors or officers] * * * (b) based upon or attributable to their gaining in fact of any personal profit or advantage to which they were not legally entitled." Neither of the defendant insurers relies upon this clause as being determinative, but it does provide a gloss in construing the intent of the policy with respect to the essential nature of the claims upon which coverage is contemplated.

portion of the contribution that each must bear is according to the benefit that each has received." (18 Am Jur 2d, Contribution, § 23; *see also,* 23 NY Jur 2d, Contribution, § 20.) Under the circumstances presented herein, there is an arguable basis for applying this equitable doctrine to the claim for reimbursement of the legal expenses of defending the *Heckmann* action.

■ On the other hand, Mr. Steinberg actually received value in the form of legal services rendered on his behalf by the joint defense of the *Heckmann* action, and he undoubtedly would have been entitled to indemnification for his defense costs if he had engaged separate counsel. The record below and the arguments advanced on this appeal do not clarify what standard ought to be applied, and the rather sparse case law addressing the question of an officer or director's entitlement to indemnification for defense costs under a D&O policy appears to favor its treatment as a factual question to be determined by a jury *(see, Pepsico, Inc. v Continental Cas. Co.,* 640 F Supp 656 [SD NY 1986]; Health-Chem Corp. v National Union Fire Ins. Co., 148 Misc 2d 187 [Sup Ct, NY County 1990]; *see generally,* Annotation, *Insurance: Construction of Policy or Bond Indemnifying Directors or Officers of Corporation for Expenses Incurred in Defending Actions Brought Against Them in Their Capacity as Such,* 49 ALR3d 1250; Siegler, Cooperatives and Condominiums, *Director, Officer Liability Insurance,* NYLJ, Jan. 6, 1993, at 3, col 1). As it is not possible that there could be any exposure for indemnification of Steinberg's legal expenses under CNA's excess policy, summary judgment dismissing the complaint as to CNA is required.

Accordingly, the order of the Supreme Court, New York County (Burton S. Sherman, J.), entered May 6, 1991, should be modified, on the law, without costs, to grant the motion of the defendant National Union Fire Insurance Company of Pittsburgh, Pa. for summary judgment dismissing the complaint only with respect to plaintiffs' claim for indemnification regarding the $21.1 million settlement of the *Heckmann v Ahmanson* litigation, and to grant the motion of the defendant Continental Casualty Company for summary judgment dismissing the complaint in its entirety, and as so modified, affirmed. The Clerk is directed to enter judgment accordingly.

MILONAS, J. (dissenting in part). I disagree with the majority only insofar as their decision relates to Reliance's claim for reimbursement of the legal expenses attributable to Steinberg.

In that regard, the opinion herein states that Steinberg "undoubtedly would have been entitled to indemnification for his defense costs if he had engaged separate counsel", but instead he was, in effect, represented in the defense of *Heckmann v Ahmanson* (168 Cal App 3d 119, 214 Cal Rptr 177), by Reliance's counsel. Therefore, the majority conclude, the issue of Steinberg's entitlement of indemnification for defense costs under the directors and officers liability and indemnity policy presents a factual matter for the determination of a jury as to whether his actions were that of a shareholder, on the one hand, or officer or director on the other.

However, in my opinion, the settlement in the *Heckmann* action in no way required Steinberg to pay any part of that settlement or to assume any obligation whatever notwithstanding that he was the controlling stockholder of Reliance and one of the defendants in that litigation. In view of the fact that Steinberg never became obligated in the slightest to make any payment or, indeed, received any benefit in his own name from the settlement, he was never responsible for any portion of the legal fees. Consequently, it is unnecessary to consider whether Steinberg's control of Reliance was strictly as a shareholder, as defendants contend and, thus, not within the scope of the insurance coverage, or whether he was acting solely as corporate officer or director, as Reliance urges. Since there was no claim against Steinberg which could properly be indemnified pursuant to the policy, none of the settlement costs being "actually and reasonably incurred" (Del Code Annot, tit 8, § 145 [a]) by him personally, the complaint should be dismissed in its entirety.

SULLIVAN, J. P., and WALLACH, J., concur with CARRO, J.; MILONAS and KUPFERMAN, JJ., dissent in part in an opinion by MILONAS, J.

Order of the Supreme Court, New York County, entered May 6, 1991, is modified, on the law, without costs, to grant the motion of the defendant National Union Fire Insurance Company of Pittsburgh, Pa. for summary judgment dismissing the complaint only with respect to plaintiffs' claim for indemnification regarding the $21.1 million settlement of the *Heckmann v Ahmanson* litigation, and to grant the motion of the defendant Continental Casualty Company for summary judgment dismissing the complaint in its entirety, and as so modified, affirmed.