**PFIZER, INC., et ano., Plaintiffs,**

v.

**STRYKER CORPORATION, et ano., Defendants.**

**No. 02 Civ. 8613(LAK).**

United States District Court, S.D. New York.

Aug. 7, 2005.

---

Charles B. Updike, Beth L. Kaufman, Schoeman, Updike & Kaufman, LLP, New York City, for Plaintiffs.

Herbert J. Stern, Joel M. Silverstein, Daniel J. Mulligan, Stern & Kilcullen, Roseland, NJ, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This is an action principally for alleged breach of defendants' obligation to indemnify plaintiffs for losses incurred as a result of products liability claims arising from the sale of knee implants following the transfer by plaintiffs to defendants of plaintiffs' knee implant business. The Court previously granted summary judgment for plaintiffs as to liability on the principal claims. Plaintiffs' damage case was tried to a jury, which returned a verdict aggregating more than $13 million. The matter now is before the Court on defendants' post-verdict motion for judgment as a matter of law dismissing certain of plaintiffs' damage claims.

*Background*

### A. The Dispute

The broad contours of this dispute have been outlined in a number of opinions and orders,[1] and only a few facts need be repeated here.

In 1998, Pfizer[2] sold its prosthetic joint and implant business to Stryker for $1.6 billion. The Stock and Asset Purchase Agreement ("Purchase Agreement") provided, in pertinent part, that Pfizer would retain responsibility for third party product liability claims arising in respect of prosthetic joints sold on or prior to the closing, while Stryker would be responsible for claims relating to joints sold after the closing. After the deal closed, the parties were sued on a number of claims arising from the sale of the Duracon Uni–Compartmental Knee ("DUK"), one of the products of the acquired business.

Pfizer brought this action against Stryker for a declaratory judgment and breach of contract for failing to indemnify it for expenses incurred from third party product liability suits brought in respect of DUKs sold after the closing. Stryker countersued principally for misrepresentation, breach of warranty and fraud. This Court granted Pfizer's motion for summary judgment to the extent of declaring that it is entitled to indemnification by Stryker for all Losses, other than punitive damages, incurred in respect of DUKs sold after the closing.[3] Stryker's cross-motion for summary judgment was denied in all respects. Pfizer's damage claim was tried to a jury on March 22, 23 and 24, 2005.

---

1. *E.g., Pfizer, Inc. v. Stryker Corp.*, No. 02 Civ. 8613(LAK), 2005 WL 221078 (S.D.N.Y. Jan. 28, 2005) (motion for separate trials); *id.*, 348 F.Supp.2d 131 (S.D.N.Y.2004) (cross motions for summary judgment); *id.*, 2003 WL 21660339 (S.D.N.Y. July 15, 2003) (motion to dismiss); *id.*, 256 F.Supp.2d 224 (S.D.N.Y. 2003) (motion to disqualify Pfizer's counsel).

2. The Court refers to the plaintiffs collectively as "Pfizer" and the defendants collectively as "Stryker."

3. *Pfizer, Inc.*, 348 F.Supp.2d at 141–45, 159.

## B. The Damages Trial

By the time the case was submitted to the jury, there were three issues,[4] only two of which are disputed here.[5]

### 1. Orrik *Claims*

The first concerned the so-called *Orrik* litigation, which involved forty plaintiffs, twenty-nine of whom received DUKs sold after the closing. On the second day of the *Orrik* trial, Pfizer and Stryker settled with all forty plaintiffs for a lump sum of $13.25 million. Stryker contributed $3.25 million, which the parties agreed would go only to the post-closing claimants, toward the global settlement. Pfizer contributed the remaining $10 million. It here claimed that $6.275 million of that amount went to post-closing plaintiffs and therefore is recoverable from Stryker under the Purchase Agreement.

Pfizer's evidence concerning this issue at the damages trial consisted principally of the testimony of its counsel in the *Orrik* case and the individual releases executed by the *Orrik* plaintiffs, which showed the amount that each received as consideration for dismissing his or her claim.[6] This evidence showed that the post-closing claimants had received $9,525,000 from the global settlement, $3.25 million of which had been contributed by Stryker.

Stryker offered testimony that it had approved only a lump sum settlement of $13.25 million to the plaintiffs and had not agreed to whatever allocation the *Orrik* plaintiffs made among themselves.[7] It offered an e-mail that purported to reserve Stryker's rights to resolve the allocation among the twenty-nine post-closing plaintiffs.[8] It offered also various letters between the Pfizer and Stryker trial teams discussing the *Orrik* settlement that similarly reserved each party's rights under the Purchase Agreement.[9]

### 2. Legal Expenses

The second issue that remains pertinent here concerns the legal expenses incurred by Pfizer for which it seeks indemnification.

The evidence at trial was to the effect that Pfizer's products liability counsel created files denominated "DUK General," "Orrik General" and "Bartlett General" that Pfizer claimed were used to record expenses incurred for services applicable to the defense of cases involving implants sold both before and after the closing. The DUK General file, for example, was a billing code for activities that were useful in every case involving a DUK, such as interviewing an engineer involved in its design,[10] irrespective of whether the DUK

---

**4.** Stryker stipulated that it had no defense to Pfizer's claim for indemnification for settlement payments by Pfizer in the amount of $6,565,110.96. Pfizer offered undisputed evidence of its legal expenses on individual post-closing cases. Stryker presented no evidence as to these expenses and did not dispute them. Pfizer consequently moved for and was granted judgment as a matter of law pursuant to Rule 50(a) as to these claims. *See Pfizer, Inc. v. Stryker Corp.*, No. 02 Civ. 8613(LAK), 2005 WL 925597 (S.D.N.Y. Apr. 20, 2005) (order and interlocutory judgment).

**5.** The other issue before the jury was what, if any, of Pfizer's payments in the *Orrik* litigation were paid to settle punitive damage claims. The jury determined that none of the payments were for punitive damages and Stryker does not contest that determination here.

**6.** Trial Tr. 77–82; Mulligan Cert., Ex. A, Plaintiff's Exhibit 215, Ex. E, Plaintiff's Exhibit P.

**7.** *See, e.g.*, Trial Tr. 225–26, 231–32.

**8.** Mulligan Cert., Ex. B, Defendant's Ex. N.

**9.** *Id.*, Ex. C, Defendant's Exs. O, Y.

**10.** Trial Tr. 93.

was sold before or after the closing of the sale of the business. In addition, Pfizer adduced evidence that its product liability counsel had done more work to handle the general background matters and had utilized more of the firm's associates to help with the litigation once it became clear that Stryker would not defend the post-closing cases.[11]

Pfizer claimed that Stryker was obliged to indemnify it for a proportion of the "general" expenses equal to the proportion of post-closing cases to the total number of cases. It offered a summary exhibit that listed the total billings and the *pro rata* share attributable, on its theory, to post-closing cases. With respect to the *Orrik* litigation, for example, the summary exhibit listed the legal billings to the Orrik general file by the firm of Goodell Devries Leech & Dann, LLP as totaling $176,065.30 and attributed 29/40th of that amount–$127,647.34–to the post-closing cases.[12]

### 3. The Verdict

At the close of the evidence, Stryker moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). It was denied and the case went to the jury. On March 24, 2005, the jury returned with a verdict for Pfizer. The jury found that Pfizer paid $6,275,000 to settle post-closing cases in the *Orrik* litigation and that no part of that amount was paid in respect of claims for punitive damages. It further found that $1,153,034.97 of the legal expenses billed to the general files—which represented half of the total billings to the general files— was attributable to post-closing cases.[13] Stryker now moves for judgment as a matter of law pursuant to Rule 50(b) vacating these awards.

### Discussion

■ A motion for judgment as a matter of law will be granted only if, "after viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in favor of the non-moving party, [the court] finds that there is insufficient evidence to support the verdict."[14] In deciding the motion, a court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury."[15] Instead, the question is whether there was "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture" or the evidence so overwhelmingly in favor of the defendants "that reasonable and fair minded [persons] could not arrive at a verdict against [them]."[16]

### A. The Orrik *Settlement*

■ Stryker first contends that the evidence of how the *Orrik* plaintiffs allocated the $13.25 million lump sum settlement among themselves should not have been admitted because it was irrelevant to Pfizer and Stryker's responsibilities under the Purchase Agreement. In essence, it argues that the Court should reverse its ruling admitting this evidence and that it would be entitled to judgment as a matter

---

**11.** *Id.* at 59.

**12.** Mulligan Cert., Ex. F, Plaintiff's Exhibit 246A

**13.** Trial Tr. 419.

**14.** *Fabri v. United Technologies Int'l, Inc.*, 387 F.3d 109, 119 (2d Cir.2004).

**15.** *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir.2001) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir.1988)).

**16.** *Toporoff Engineers, P.C. v. Fireman's Fund Ins. Co.*, 371 F.3d 105, 108 (2d Cir.2004) (internal quotation marks and citation omitted; alterations in original).

of law on this point if that evidence were disregarded.

There was no error in admitting the evidence. " 'Relevant evidence' means evidence having *any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." [17] It cannot seriously be suggested that the amounts actually paid to post-closing *Orrik* plaintiffs had "no tendency" to demonstrate the amounts paid to settle post-closing cases. The fact that Stryker did not agree to be bound by the allocation of the lump sum settlement by the *Orrik* plaintiffs, while undisputed, went to the weight rather than to the sufficiency of the evidence. While the jury was not obliged to accept the *Orrik* plaintiffs' allocation, its conclusion that Pfizer paid $6,275,000 to settle the post-closing claims ($9,525,000 less the $3.25 million contributed by Stryker) was entirely reasonable.

## B. Legal Expenses Billed to the General Files

Stryker next challenges the jury's determination that $1,578,998.96 of the legal expenses billed to the DUK General, Orrik General and Bartlett General files was expended in the defense of post-closing cases.[18] Its argument is based on Sections 2.5 and 2.6 of the Purchase Agreement.

Section 2.5 of the Purchase Agreement provides that Stryker would be responsible for obligations of the business termed "Assumed Liabilities." These included, *inter alia,*

> "all Liabilities resulting from a claim by a third party for money or other com-

pensation (beyond the cost of a particular product) in respect of injury allegedly due and owing as a result of the use or application of a product of the Business sold after the Closing Date, including, without limitation, warranty obligations and irrespective of legal theory asserted." [19]

In turn, Section 2.6 of the Purchase Agreement provided that Pfizer would be responsible for certain obligations of the business sold that were termed "Retained Liabilities." In pertinent part, it stated:

> "Notwithstanding any provision in this Agreement, the Seller Corporations shall retain and be responsible for the following . . ."

> "(g) Liabilities resulting from a claim by a third party for money or other compensation (beyond the cost of a particular product) in respect of injury allegedly due and owing as a result of the use or application of a product of the Business sold on or prior to the Closing Date, including, without limitation, warranty obligations and irrespective of the legal theory asserted." [20]

Stryker contends that, when read together, these sections provide that any expense that is a Retained Liability cannot also be an Assumed Liability for which Stryker is responsible. In consequence, it asserts, any legal work that was used in Pfizer's defense of the pre-closing cases is a Retained Liability notwithstanding the fact that it also might have been helpful to the defense of post-closing cases. Stryker maintains further that the evidence showed that all of the billings to the general files were for work that was useful to

---

**17.** FED.R.EVID 401 (emphasis added).

**18.** Specifically, the jury was asked: "Has Pfizer proved, by a preponderance of the evidence, how much of the legal expenses billed to the 'DUK General,' 'Orrik General' and 'Bartlett General' files was incurred for the

defense of the post-closing cases?" *See* Trial Tr. 419.

**19.** Purchase Agreement § 2.5(c).

**20.** *Id.* § 2.6(g).

both pre- and post-closing cases and therefore were Retained Liabilities that cannot be shifted to it.[21]

Pfizer does not address directly Stryker's interpretation of the Purchase Agreement, but disputes its characterization of the evidence. It contends that the evidence showed that Pfizer would not have incurred all of the expenses had it not been forced by Stryker's breach to defend the post-closing cases. It points out that Richard Barnes, its products liability counsel, testified that "[o]nce it became clear that we would be responsible not for just pre-closing cases but post-closing cases, we undertook a very detailed investigation of the facts and circumstances surrounding the case."[22] He testified also that he utilized more lawyers and other persons in his office to work on the cases than they would have if only defending the pre-closing cases.[23]

Viewed in the light most favorable to the non-movant, a reasonable jury could have inferred that not all of Pfizer's legal costs billed to the general files were incurred in the defense of pre-closing cases or would have been had Stryker accepted Pfizer's tender of the defense of those cases. Although the testimony indicated that the activities billed to the general files were applicable to both pre- and post-closing cases, it indicated also that Stryker's re-fusal to defend the post-closing cases meant more work and thus increased billings for Pfizer's lawyers. On the basis of Barnes' testimony, for example, a reasonable jury could have inferred that his firm billed Pfizer for more hours than it would have if Stryker had defended the post-closing suits. In short, assuming *arguendo* that Stryker's interpretation of the Purchase Agreement is correct, a point on which the Court need express no view, the jury was entitled to believe that some part of the expenses billed to the general files were generated as a result of defending the post-closing suits.

The next question is whether the jury had a sufficient basis on which to attribute half of the legal expenses billed to the general files to post-closing cases.

When a party incurs expenses in the defense of covered and non-covered claims, it may allocate the legal expenses incurred if there is a factual basis for the allocation.[24] Although there is little authority on the allocation of covered and non-covered expenses, at least one New York court has held that a party seeking indemnity has the initial burden to establish that an expense was incurred in the defense of a covered claim. Once such proof is introduced, "the burden of showing that all or a specific portion of it was incurred in defense of a non-covered

---

21. *See, e.g.,* Trial Tr. 27, Pfizer Opening Statement ("Because the general number encompassed both pre-closing and post-closing cases, Pfizer is not seeking all of the legal fees that were devoted to the general number."); *see also id.* at 93, Testimony of Richard Barnes ("The general activities were applicable to all 54 cases. To defend all 54 cases we applied to the DUK general file.").

22. *Id.* at 60.

23. *Id.* at 59.

24. *See Health–Chem Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 148 Misc.2d 187, 191, 559 N.Y.S.2d 435, 438 (1990); *see also*

*Reliance Grp. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 188 A.D.2d 47, 58, 594 N.Y.S.2d 20, 26 (1st Dept.1993) (noting the trend in New York to treat allocation as a factual matter); *cf. H.S. Equities, Inc. v. Hartford Accident & Indem. Co.,* 661 F.2d 264 (2d Cir.1981) (indemnitor may apportion lump sum settlement according to covered and non-covered parties); *PepsiCo, Inc. v. Continental Cas. Co.,* 640 F.Supp. 656, 661–62 (S.D.N.Y.1986) (same), *criticized on other grounds in Waltuch v. Conticommodity Servs. Inc.,* 88 F.3d 87, 93 (2d Cir.1996).

[claim] is on [the] defendant."[25] The Court applies this framework here.

 As noted, Pfizer adduced evidence that the defense of post-closing cases required its lawyers to do some work that would not have been done had Stryker discharged its duty to defend those cases. None of the evidence, however, indicated how much of the work in the general files was attributable to the post-closing cases. Pfizer's witness Richard Barnes did not point to any expense in the general file that was incurred as a result of its defense of the post-closing cases. Nor did he provide a general indication of the amount by which the defense of the post-closing cases increased the work billed to the general files. Simply put, Pfizer did not provide the jury any evidence on which to base its allocation and consequently did not carry its initial burden to establish that any particular expense or portion of the expenses was incurred in the defense of post-closing claims. The jury's conclusion therefore could have been only conjecture. Stryker is entitled to judgment as a matter of law on this question.

## Conclusion

For the foregoing reasons, Stryker's renewed motion for judgment as a matter of law [docket item 192] is granted to the extent that the jury's award of $1,153,034.97 to Pfizer for legal expenses billed to the general files is vacated. The motion is denied in all other respects. Judgment will enter in accordance with the jury's verdict as modified by this decision.

SO ORDERED.

**25.** *Health–Chem Corp.,* 148 Misc.2d at 191, 559 N.Y.S.2d at 438.