[936 NYS2d 102]

J.P. Morgan Securities Inc. et al., Respondents, v Vigilant Insurance Company et al., Appellants.

First Department, December 13, 2011

## APPEARANCES OF COUNSEL

*DLA Piper LLP (US)*, New York City (*Joseph G. Finnerty III, Megan Shea Harwick, Eric S. Connuck* and *Miles D. Norton* of counsel), for Vigilant Insurance Company and Federal Insurance Company, appellants.

*Drinker Biddle & Reath LLP*, New York City (*Douglas M. Mangel, Marsha J. Indych, Ericka R. Lenz* and *David F. Abernathy* of counsel), for Travelers Indemnity Company, appellant.

*D'Amato & Lynch, LLP*, New York City (*Luke D. Lynch, Jr., Richard F. Russell* and *Liza A. Chafiian* of counsel), for National Union Fire Insurance Company of Pittsburgh, Pa., appellant.

*Kaufman Borgeest & Ryan LLP*, New York City (*Scott A. Schechter* of counsel), for Liberty Mutual Insurance Company, appellant.

*Clyde & Co. US LLP*, New York City (*Edward J. Kirk* and *Allison M. Calkins* of counsel), for Certain Underwriters at Lloyd's London, appellant.

*Landman Corsi Ballaine & Ford P.C.*, New York City (*Michael L. Gioia* of counsel), for American Alternative Insurance Corporation, appellant.

*Proskauer Rose LLP*, New York City (*John H. Gross, Francis D. Landrey, Steven E. Obus* and *Seth Schafler* of counsel), for respondents.

### OPINION OF THE COURT

ANDRIAS, J.

The disgorgement payment to the Securities and Exchange Commission (SEC) in settlement of charges that plaintiffs' predecessors wilfully facilitated illegal mutual fund trading practices does not constitute an insurable loss under the primary professional liability policy issued by defendant Vigilant Insurance Company or the "follow the form" excess policies issued by the other insurer defendants. Accordingly, we reverse and grant defendants' motions to dismiss the complaint.

In 2006, the SEC notified Bear Stearns & Co., Inc., an introducing broker, and Bear Stearns Securities Corp., a clearing firm, (collectively Bear Stearns), that it intended to institute proceedings against them seeking broad injunctive relief and monetary sanctions of $720 million. The SEC alleged that between 1999 and September 2003, Bear Stearns, in violation of

securities law, knowingly facilitated a substantial amount of late trading and deceptive market timing for certain customers, predominantly large hedge funds, and affirmatively assisted them in evading detection, which enabled those customers to earn hundreds of millions of dollars in profits at the expense of mutual fund shareholders.[1] Bear Stearns disputed these allegations in a "Wells Submission" in which it asserted that for the most part it was a clearing broker that processed transactions initiated by others, that it did not knowingly violate any law or regulation, that its management and supervisory personnel did not facilitate either market timing or late trading, and that it did not share in the profits or benefit in any way from the late trading, which generated only $16.9 million in revenue to Bear Stearns.

On or about November 17, 2005, Bear Stearns made a formal offer of settlement which the SEC accepted. On March 16, 2006, the SEC issued an "Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 15 (b) and 21C of the Securities Exchange Act of 1934, Making Findings and Imposing Remedial Sanctions" (SEC Order) in which Bear Stearns, "without admitting or denying the findings [made pursuant to its offer of settlement]," agreed to pay "disgorgement in the total amount of $160,000,000" and "civil money penalties in the amount of $90,000,000."[2] The SEC also censured Bear Stearns for its willful violations, ordered it to "cease and desist" from future violations and mandated business restructuring to prevent future illegal trading. On March 10, 2006, the New York Stock Exchange (NYSE) issued Exchange Hearing Panel Decisions that included factual findings substantively identical to the SEC's. NYSE levied a sanction of

---

1. Mutual funds generally are required to calculate their net asset values daily by 4:00 P.M. Eastern Standard Time, when the closing bell rings on the major U.S. stock exchanges (17 CFR 270.22c-1 [b] [1]). Late trading is the illegal practice of permitting a purchase or redemption order received after the 4:00 P.M. pricing time to receive the share price calculated as of 4:00 P.M. that day before the release of any after-market information (*see e.g. Securities & Exch. Commn. v Pentagon Capital Mgt. PLC*, 612 F Supp 2d 241, 248 [SD NY 2009]). "Market timing is a mutual fund share trading strategy that exploit[s] brief discrepancies between the stock prices used to calculate the shares' value once a day, and the prices at which those stocks are actually trading" (*Securities & Exch. Commn. v Ficken*, 546 F3d 45, 48 [1st Cir 2008] [internal quotations marks omitted]).

2. The SEC's practice of allowing settlements in which the wrongdoer does not admit or deny the finding of facts has been subject to criticism (*see Securities & Exch. Commn. v Vitesse Semiconductor Corp.*, 771 F Supp 2d 304, 309-310 [SD NY 2011]).

"$160,000,000 as disgorgement" and "$90,000,000 as a penalty," which would be deemed satisfied by Bear Stearns's payment of the sanctions imposed by the SEC.

The insurance program at issue obligates the insurers to indemnify Bear Stearns for all "Loss which the insured shall become legally obligated to pay as a result of any Claim . . . for any Wrongful Act" on its part. The term "Loss" includes

"(1) compensatory damages, multiplied damages, punitive damages where insurable by law, judgments, settlements, costs, charges and expenses or other sums the Insured shall legally become obligated to pay as damages resulting from any claim; [and (2)] costs, charges and expenses or other damages incurred in connection with any investigation by any governmental body or self-regulatory organization (SRO), provided however, Loss shall not include: (i) fines or penalties imposed by law; or . . . (v) matters which are uninsurable under the law pursuant to which this policy shall be construed."

The term "Wrongful Act" means "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by the Insured(s) in providing services as a Security Broker/Dealer and/or Investment Advisor and/or Administrator."

The program excludes claims made against the insured "based upon or arising out of any deliberate, dishonest, fraudulent or criminal act or omission," provided there has been an adverse final adjudication to that effect. It also excludes claims "based upon or arising out of the Insured gaining in fact any personal profit or advantage to which the Insured was not legally entitled." The Lloyd's of London excess policy also includes a "Known Wrongful Acts Exclusion" which excluded claims for Wrongful Acts committed before March 21, 2000 "if any officer of the Assured, at such date, knew or could have reasonably foreseen that such Wrongful Act(s) could lead to a Claim."

Plaintiffs demanded that defendant insurers indemnify Bear Stearns for the disgorgement payment under the program. Defendant insurers refused on the ground that the payment was not an insurable loss, or was excluded from coverage. Plaintiffs then commenced this action for breach of contract and a declaration that defendants had a duty to indemnify them, asserting that the disgorgement payment, despite its label, constituted compensatory damages.

Disgorgement is an equitable remedy aimed at "forcing a defendant to give up the amount by which he was unjustly enriched" through violations of the federal securities laws (*Securities & Exch. Commn. v Tome*, 833 F2d 1086, 1096 [2d Cir 1987]; *see also Securities & Exch. Commn. v Fischbach Corp.*, 133 F3d 170, 175 [2d Cir 1997] ["The primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains"]). Securities Act section 8A (e), Securities Exchange Act section 21B (e), and Securities Exchange Act section 21C (e) authorize the SEC to seek disgorgement in a cease-and-desist proceeding and a proceeding in which a civil money penalty may be imposed (15 USC § 77h-1 [e]; § 78u-2 [e]; § 78u-3 [e]).

Under New York law, "[t]he risk of being directed to return improperly acquired funds is not insurable" (*Vigilant Ins. Co. v Credit Suisse First Boston Corp.*, 10 AD3d 528, 528 [2004]). Thus, disgorgement of ill-gotten gains or restitutionary damages does not constitute an insurable loss (*see Millennium Partners, L.P. v Select Ins. Co.*, 68 AD3d 420 [2009], *appeal dismissed* 14 NY3d 856 [2010]; *Reliance Group Holdings v National Union Fire Ins. Co. of Pittsburgh, Pa.*, 188 AD2d 47, 55 [1993], *lv dismissed and denied* 82 NY2d 704 [1993]). The public policy rationale for this rule is that the deterrent effect of a disgorgement action would be greatly undermined if wrongdoers were permitted to shift the cost of disgorgement to an insurer, thereby allowing the wrongdoer to retain the proceeds of his or her illegal acts (*see Vigilant Ins. Co. v Credit Suisse First Boston Corp.*, 6 Misc 3d 1020[A], 2003 NY Slip Op 51747[U] [2003], *mod* 10 AD3d 528 [2004], *supra*).

In *Millennium Partners*, the insured disgorged $148 million in connection with a market timing investigation by the SEC. Although the settlement agreements did not specifically state that the disgorgement was for improperly obtained funds, we affirmed the grant of summary judgment to the insurers on the ground that the findings recited in the orders with the SEC and the Attorney General of the State of New York "conclusively link[ed] the disgorgement to improperly acquired funds," notwithstanding that the plaintiff consented and agreed to these orders "without admitting or denying the findings [t]herein" (68 AD3d at 420; *see also Reliance Group v National Union*, 188 AD2d at 55 [the settlement of the action was essentially equivalent to a determination, reached through agreement of the parties, that plaintiff had been unjustly enriched through its ac-

tions]). Here too, read as a whole, the offer of settlement, the SEC Order, the NYSE order and related documents are not reasonably susceptible to any interpretation other than that Bear Stearns knowingly and intentionally facilitated illegal late trading for preferred customers, and that the relief provisions of the SEC Order required disgorgement of funds gained through that illegal activity.

The SEC Order illustrates how the Bear Stearns timing desk actively collaborated with Bear Stearns's clients to execute illegal mutual fund trading. Specifically, Bear Stearns processed these late trades as if they had been submitted hours earlier and then "falsified internal order tickets" to misrepresent that it had received late trading orders prior to the 4:00 P.M. deadline.

The SEC Order details how Bear Stearns operated its late trading and market timing scheme in direct disregard of demands by mutual funds that Bear Stearns stop allowing timing in their funds. In response, rather than prevent the timing activity, Bear Stearns assigned "multiple account numbers to customers so that the mutual funds could not identify them as customers whose trades they had previously blocked, or by assigning multiple [registered representative] numbers to registered representatives at [Bear Stearns] to try to conceal the identity of the traders." The SEC Order also specifies that in multiple taped telephone conversations, a Bear Sterns supervisor and a timing desk employee specifically advised a new customer (broker) that late trades would be "populated" at either "4:00 or 3:59." Further, the "PCS Administrative Head," and the "MFOD Administrative Head," when recruiting a new broker, discussed the "cut off" time to do trades (5:45 P.M.), and certain department heads discussed the cut off time with a new customer, a large Texas hedge fund, and a Florida correspondent broker. Based on these findings, the SEC concluded that Bear Stearns:

> (1) "willfuly violated, willfuly aided and abetted, and caused violations of" section 17 (a) of the Securities Act, and section 10 (b) of the Securities Exchange Act and rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities;

> (2) "willfuly violated, willfuly aided and abetted, and caused violations of Section 15 (c) of the Exchange Act and Rule 15c-1-2 thereunder, which

prohibit a broker or a dealer from effecting transactions in, or inducing or attempting to induce, the purchase or sale of securities (other than on a national securities exchange of which it was a member) by means of a manipulative, deceptive, or other fraudulent device or contrivance;"

(3) "willfuly violated" and "willfuly aided and abetted, and caused violations of Rule 22c-1 (a)," as adopted under section 22 (c) of the Investment Company Act, which requires mutual fund shares to be sold and redeemed at a price based on the net asset value computed after receipt of an order to buy or redeem; and

(4) "willfuly violated, willfuly aided and abetted, and caused violations of Section 17 (a) of the Exchange Act and Rule 17a-3 (a) (6) thereunder[,] . . . by preparing inaccurate records and by, among other things, falsifying [mutual fund] order tickets."

Given these findings, it cannot be seriously argued that Bear Stearns was merely found guilty of inadequate supervision and a failure to place adequate controls on its electronic entry system.[3]

The fact that the SEC did not itemize how it reached the agreed upon disgorgement figure does not raise an issue as to whether the disgorgement payment was in fact compensatory.[4] Although the disgorged amount must be "causally connected to

---

**3.** In this regard, we note that in an SEC press release, the Director of the Northeast Regional Office of the SEC explained:

"Bear Stearns was the Northeast hub that connected the many spokes of market timing and late trading—hedge funds, brokers and the mutual funds. Tape-recorded phone calls of its employees make plain the two roles played by Stearns that were fundamental to mutual fund trading abuses. Bear Stearns made it possible for hedge funds and brokers to submit orders long after the 4:00 pm cut off. Bear Stearns made it easier for the hedge funds and the brokers to engage in market timing, and harder for the mutual funds to detect and stop it."

Similarly, the chief executive officer, NYSE Regulation, Inc., stated in his press release: "It is disturbing how so many people in so many different units [at Bear Stearns] worked to circumvent the blocks and restrictions set up by the mutual funds . . . This type of behavior is completely outrageous and unacceptable."

**4.** While the SEC order does not set forth the amount of Bear Stearns's ill gotten gains, SEC's Enforcement Director stated in a press release:

the violation" (*see Securities & Exch. Commn. v First Jersey Sec., Inc.*, 101 F3d 1450, 1475 [2d Cir 1996]), the SEC "is not required to trace every dollar of proceed[s]" or "to identify misappropriated monies which have been commingled" (*Securities & Exch. Commn. v Anticevic*, 2010 WL 3239421, *5, 2010 US Dist LEXIS 83538, *14 [SD NY 2010] [internal quotation marks omitted]). Accordingly, a disgorgement calculation requires only a "reasonable approximation of profits causally connected to the violation" (*Securities & Exch. Commn. v First Pac. Bancorp*, 142 F3d 1186, 1192 n 6 [9th Cir 1998] [citation omitted]), and the amount of disgorgement should include "all gains flowing from the illegal activities" (*Securities & Exch. Commn. v JT Wallenbrock & Assoc.*, 440 F3d 1109, 1114 [9th Cir 2006]). Further, joint and several liability for combined profits may be imposed on collaborating or closely related parties (*see Securities & Exch. Commn. v AbsoluteFuture.com*, 393 F3d 94, 97 [2d Cir 2004]; *see also SEC v Anticevic*, 2010 WL 3239421, *5, 2010 US Dist LEXIS 83538, *14 [SD NY 2010], *supra* [in insider trading cases, the tipper may be held jointly and severally liable for the profits obtained by his tippees]). Here, in addition to admittedly generating at least $16.9 million in revenues for itself, Bear Stearns knowingly and affirmatively facilitated an illegal scheme which generated hundreds of millions of dollars for collaborating parties and agreed to disgorge $160 million in its offer of settlement.

Nor is the nature of the disgorgement payment altered by the fact that the $250 million sanction was to be placed in a Fair Fund pursuant to section 308 (a) of the Sarbanes-Oxley Act of 2002 to be distributed to compensate investors harmed in the mutual funds.

> "[M]ost SEC cases involving a substantial economic settlement include a provision providing for distributions to aggrieved investors. This is because 'once the primary purpose of disgorgement has been served by depriving the wrongdoer of illegal profits, the equitable result is to return the money to the

"For years Bear Stearns helped favored hedge fund customers evade the systems and rules designed to protect long term mutual fund investors from the harm of market timing and late trading. As a result, market timers profited while long term investors lost. *This settlement will not only deprive Bear Stearns of the gains it reaped by its conduct,* but also require Bear Stearns to put in place procedures to prevent similar misconduct from recurring" (emphasis added).

victims of the violation' " (*Securities & Exch. Commn. v Bear, Stearns & Co. Inc.*, 626 F Supp 2d 402, 407 [SD NY 2009]; *see also SEC v Fischbach*, 133 F3d at 175 ["Although disgorged funds may often go to compensate securities fraud victims for their losses, such compensation is a distinctly secondary goal"]).

Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered September 14, 2010, which denied defendants' motions to dismiss the complaint, should be reversed, on the law, without costs, and the motions granted. The Clerk is directed to enter judgment dismissing the complaint.

TOM, J.P., FRIEDMAN, ABDUS-SALAAM and ROMÁN, JJ., concur with ANDRIAS, J.

Order, Supreme Court, New York County, entered September 14, 2010, reversed, on the law, without costs, and the motions granted. The Clerk is directed to enter judgment dismissing the complaint.