**GREEN LEAVES RESTAURANT, INC., Appellant,**

v.

**617 H STREET ASSOCIATES, Appellee.**

**Michael Cheah, Appellant,**

v.

**617 H Street Associates, Wan Kam Lee, and Kevin Yu, Appellees.**

**Kevin Yu and Wan Kam Lee, Appellants,**

v.

**617 H Street Associates and Michael Cheah, Appellees.**

Nos. 04–CV–1359, 06–CV–1179, 06–CV–1193

District of Columbia Court of Appeals.

Argued Dec. 16, 2008.

Decided June 25, 2009.

Marc S. Moskowitz for Michael Cheah and Green Leaves Restaurant, Inc.

Frederic W. Schwartz, Jr., for Kevin Yu and Wan Kam Lee.

James T. Maloney for 617 H Street Associates.

Before REID, GLICKMAN and THOMPSON, Associate Judges.

GLICKMAN, Associate Judge:

These consolidated appeals pit guarantors of a commercial lease against the landlord and each other. In the proceedings below, the landlord entered into a settlement agreement with the tenant, a corporation wholly owned by the guarantors, to recover possession of the leased premises after the tenant defaulted on its obligations in the wake of a disastrous fire.

The landlord thereafter secured a judgment against each of the guarantors for unpaid rent and other damages, including attorney's fees. In the same action, the guarantors were adjudged liable to each other for contribution but not full indemnification. The appeals raise four main issues: (1) whether one of the guarantors had the authority he claimed to have to enter into the settlement agreement with the landlord on the tenant's behalf; (2) whether the settlement operated to release another guarantor from his obligations to the landlord; (3) whether the guarantors are jointly liable to the landlord for the attorney's fees it incurred to enforce their guarantees; and (4) whether the guarantors must contribute equally to pay their common debt (as the trial court ruled) or in proportion to their ownership interests in the principal obligor.

For the most part, we affirm the judgments on appeal. We uphold the validity of the settlement pursuant to which the landlord regained possession from the tenant and conclude that it did not operate to discharge the objecting guarantor. We also hold that the guarantors are liable for the landlord's attorney's fees. However, while we affirm the trial court's rejection of the guarantors' cross-claims for full indemnification, we remand for further consideration of the proper measure of their contributive shares.

## I. Factual Background[1]

On May 29, 2001, Green Leaves Restaurant, Inc. ("Green Leaves"), a newly created District of Columbia business corporation, signed a five-year lease with 617 H Street Associates for a building in the Washington, D.C., neighborhood commonly known as Chinatown. Green Leaves's three shareholders—Michael Cheah, Kevin Yu, and Wan Kam Lee—signed the lease as guarantors, "individually and severally warrant[ing]" that all of the tenant's obligations would be "the personal responsibility and liability of each and all of" them as well. In addition to paying rent and local business taxes, Green Leaves's obligations under the lease included securing adequate fire insurance coverage and maintaining the condition of the premises.

The three owners of Green Leaves also served as its officers and directors. Michael Cheah, who was a 50% shareholder, was Green Leaves's president. Kevin Yu, a 25% shareholder, was corporate secretary. Wan Kam Lee, also a 25% shareholder, was vice-president. Of the three investors, only Cheah had experience as a restaurateur. Cheah already owned several other restaurants, and during the summer and fall of 2001 he was constructing a new Malaysian restaurant in Bethesda, Maryland. In contrast, Yu and Lee had little relevant business experience. Yu was only twenty-years-old; his father, Kam Yu, bankrolled his investment in Green Leaves so that he could learn the restaurant business from Cheah. (Kam Yu had a restaurant of his own in Chinatown, in which his son had worked as a waiter and delivery-man.) Lee was a housewife; her husband owned the Kwong Wong Construction Company, which Cheah had hired as the contractor for his restaurant in Bethesda. Cheah originally expected Yu's father and Lee's husband to be his partners in Green Leaves, but with his consent they substituted Kevin Yu and Wan Kam Lee at the last minute. Perhaps for that reason, Cheah, Yu and Lee failed to discuss or clarify their individual roles and responsibilities in the new enterprise.

---

**1.** Our summary of the facts is based largely on the trial court's findings following a bench trial in the landlord's damages action.

The building leased by Green Leaves housed a Chinese restaurant, which Green Leaves purchased for $60,000. Cheah, Yu and Lee contributed the funds for that acquisition in proportion to their shareholdings. Their plan was to convert the property to a Malaysian restaurant after Cheah completed his pending project in Bethesda and could turn his attention to the Chinatown venture. In the meantime, Green Leaves retained the incumbent manager to continue running the Chinese restaurant. Cheah, Yu and Lee did not involve themselves in the restaurant's operation.

Green Leaves's plans for 617 H Street were never realized. Only four months after the lease was signed, a fire gutted the restaurant. In the aftermath of this calamity, it was discovered that Green Leaves had neglected to obtain fire insurance coverage in an amount equal to the full replacement value of the premises, as the lease required. Cheah, Yu and Lee had never discussed who would be responsible for attending to this obligation. (Cheah subsequently claimed that Yu's father had promised him he would take care of it for them.) The only applicable insurance was a pre-existing $75,000 policy (with a $1,000 deductible) that covered damage to the restaurant kitchen. With property damage ranging from $120,000 (Cheah's initial rough estimate) to $400,000 (the insurance adjustor's estimate), the kitchen policy was plainly inadequate to fund the necessary repairs. The restaurant ceased operations. Green Leaves stopped paying rent, which began to accrue at the rate of $10,000 a month and increased to $11,000 a month in the second year of the lease. At some point following the fire, Cheah and his fellow shareholders ceased communicating with each other.

There was a lengthy delay in obtaining the proceeds of the $75,000 insurance policy, apparently because Cheah insisted that the carrier cover the entire loss without regard to the coverage limits. Ultimately, in September 2002, after Cheah effectively bowed out, Yu dealt with the insurance company and agreed on Green Leaves's behalf to accept the policy limit. Yu deposited the insurance proceeds (which, net of the deductible, amounted to $74,000) in Green Leaves's corporate bank account and disbursed $20,000 to 617 H Street Associates in partial payment of the rent arrearage.

Without Cheah's participation, Yu also obtained bids to repair the fire-damaged building from Kwong Wong Construction (the company owned by Lee's husband) and a second contractor. Yu hired Kwong Wong to repair the fire-damaged building for $212,000, which was the lower of the two bids he had received. Yu used the remaining $54,000 in insurance proceeds to pay Kwong Wong, and he and Lee together paid the balance due of $158,000 in equal shares with financial help from Yu's father.[2] Cheah, who had not been consulted, did not contribute to the cost of the premises restoration.

## II. The Litigation

By the end of 2002, Green Leaves was in arrears for more than a year's worth of

---

2. Yu was unable to document his claimed payments to cover the cost of repairs. Nonetheless, the judge credited his testimony (which was not entirely uncorroborated) and rejected Cheah's assertion that Yu had failed to account for at least $30,000 in insurance funds. The judge's credibility determinations and related factual findings are not clearly erroneous, and we cannot reject them. (Cheah's complaint that the judge denied his request that Yu and Lee furnish an accounting of their use of the insurance proceeds is pointless and without merit, inasmuch as the entire fund was applied to reduce Green Leaves's and the guarantors' indebtedness and Cheah was credited with that use.)

back rent, and the fire damage was still unrepaired. The landlord then brought two actions in Superior Court. First, on December 16, 2002, 617 H Street Associates sued Green Leaves and its shareholders, the latter in their capacity as guarantors. The complaint sought monetary damages for unpaid rent, estimated repair costs, and anticipatory breach of the lease. Green Leaves never answered the complaint. The guarantors answered and cross-claimed against each other for indemnification or contribution. Cheah filed his answer and cross-claims in January 2003. Yu and Lee, who were not served with the complaint for several months, did not answer until October 2003.

Second, in March 2003, 617 H Street Associates sued Green Leaves in the Landlord and Tenant Branch of Superior Court to recover possession of its property. On the return date, April 18, 2003, Yu appeared in court and executed an affidavit stating that he was an officer of Green Leaves and was authorized to enter into a binding consent agreement on its behalf. Yu then signed a settlement agreement with Audrey Wong, the managing partner of 617 H Street Associates. The agreement provided that Green Leaves would pay the rent arrearage of $152,000 on or before April 20, 2003 (i.e., within two days). The agreement further provided that if the overdue rent was not paid by April 20, Green Leaves would vacate the leased property and the landlord would take immediate possession and then "seek judgement [sic] against any officer of Green Leaves Restaurant, Inc. pursuant to the lease agreement." As the parties anticipated, Green Leaves made no payment, and 617 H Street Associates repossessed the building on April 20. The next day,

617 H Street Associates leased the property to Yu's father.

Yu entered into the settlement agreement with the consent of Lee, but without the consent of Cheah. In March of 2004, Cheah moved in Green Leaves's name to vacate the settlement—among other reasons, on the ground that Yu lacked authority to settle on the corporation's behalf—and to dismiss the landlord and tenant action. The case was consolidated with the landlord's still-pending damages action against the guarantors, in which the parties filed cross-motions for summary judgment.

In September 2004, the court denied Green Leaves's and Cheah's motions and awarded partial summary judgment to the landlord with respect to the defendants' obligation to pay rent through April 20, 2003,[3] plus local business taxes and attorney's fees in amounts to be determined at trial. In a subsequent order, the court granted partial summary judgment to Yu and Lee on Cheah's cross-claims against them for full indemnification and an accounting. Following a bench trial, the court granted final judgment to 617 H Street Associates for $1,239.49 in business taxes and $21,495.51 in attorney's fees. The court further ruled that the three guarantors were entitled to contribution from each other on an equal basis—meaning that each guarantor would be obligated to contribute one-third of the total liability—for the rent, taxes and attorney's fees awarded to the landlord and the $158,000 paid by Yu and Lee to fulfill Green Leaves's contractual obligation to repair the premises.

---

3. The court directed the parties to submit a proposed consent order specifying the precise amount of rent due through April 20, 2003, which the court had not computed. The par-

ties did not comply, however, and as a result, the exact amount of the unpaid rent was omitted in the final judgment below. This omission should be rectified on remand.

## III. Validity of the Settlement Agreement

Green Leaves (at Cheah's direction)[4] argues that the motions judge erred in denying its motion to vacate the settlement agreement with 617 H Street Associates. The question turns on whether Yu possessed either actual or apparent authority to enter into that agreement on behalf of the corporation. The judge doubted that Green Leaves had established Yu's lack of actual authority as a corporate officer, and found that, in any event, Yu was invested with apparent authority. We conclude that the judge was correct on both counts.

Generally speaking, actual authority in private corporations and other private-sector organizations originates both with the statute through which the organization achieves a legally recognized form and with the organization's constitutional documents. These provide the skeleton or essential architecture for beginning to determine which acts committed by human actors should be attributed to the organization. An organization's charter, certificate of incorporation, articles, and bylaws typically specify, among other basic structural matters, certain key positions within the organization and authority to act on behalf of the organization that is associated with each position. Private-sector organizations formed as corporations have a governing body ordinarily known as a board of directors ... that, by statute, must take specified types of actions and that also, by statute, is assigned ultimate supervisory responsibility for the corporation's business and affairs. Directors commonly appoint officers for the corporation. Officers hold defined executive positions carrying titles; the nature and scope of each officer's authority may be defined by statute, by the corporation's constitutional documents, by specific resolutions adopted by the directors, and by custom associating specific functions with a particular position.[5]

Under the law of the District of Columbia, Yu's authority as a corporate officer to act on behalf of Green Leaves was governed in the first instance by the corporation's by-laws and any applicable resolution of the board of directors "not inconsistent" with the bylaws.[6] But Green Leaves did not produce its bylaws or any board resolution in support of its contention that Yu lacked the requisite authority; it fairly may be held to have waived any claim that the bylaws limited Yu's powers.[7] Green

---

4. Yu and Lee have not disputed Cheah's authority to direct the corporation's actions in these appeals or in moving to vacate the settlement agreement in landlord and tenant court.

5. RESTATEMENT (THIRD) OF AGENCY § 1.03 comment c (2006).

6. D.C.Code § 29–101.43(b) (2001) ("All officers and agents of the corporation, as between themselves and the corporation, shall have such authority and perform such duties in the management of the property and affairs of the corporation as may be provided in the bylaws, or as may be determined by resolution of the board of directors not inconsistent with the bylaws."). A so-called "close corpo-

ration" may be managed by its shareholders instead of by a board of directors, if its articles of incorporation so provide. *Id.* § 29–101.165 (2001). However, Green Leaves does not claim to have fulfilled the statutory requirements for becoming a close corporation. *See id.* § 29–101.156 *et seq.* (2001). Its articles of incorporation are not in the record before us.

7. *Cf. International Tours & Travel, Inc. v. Khalil,* 491 A.2d 1149, 1153 (D.C.1985) ("[W]e must conclude that had the bylaws prohibited [the corporation's] president from filing suit without authorization by the board of directors they would have been introduced as dispositive.").

Leaves was a small corporation with only three officers; it cannot be presumed that Yu lacked general officer authority in this context merely because his title was "secretary" rather than "president," or because he was not the principal shareholder. Yu may have had no role in managing Green Leaves's restaurant before the fire, but he took a major role afterward in collecting the available insurance and redressing the damage. And while Yu executed the settlement agreement without the approval of Cheah, Green Leaves's president and 50% shareholder, Green Leaves did not show that Yu needed Cheah's approval under the bylaws or otherwise. Indeed, Lee supported Yu's action, and the two of them made up a majority of Green Leaves's board of directors. To be sure, Yu presented no evidence that the board formally and properly authorized or ratified his action. But the allocation of the burden of proof is determinative. The "burden is on [a corporation] challenging [the] authority of [its] officer to act to show he did not possess [the] power he assumed to exercise, and it is insufficient merely to show [that the] board of directors did not authorize it." [8] On this record, we hold that Green Leaves failed to carry its burden of proving Yu's lack of actual authority.

■ Alternatively, we hold that the undisputed evidence supports the judge's factual determination that Yu had apparent authority to enter into the settlement agreement on behalf of Green Leaves by virtue of Cheah's own actions in response to 617 H Street Associates's first complaint in Superior Court.[9] "[A]pparent authority arises when a principal places an agent in a position which causes a third person to reasonably believe the principal had consented to the exercise of authority the agent purports to hold." [10] Apparent authority thus may exist without the principal's express authorization of the agent's representations or conduct:

> Apparent authority depends upon the third-party's perception of the agent's authority. The third party's perception may be based upon written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on [his] behalf by the person purporting to act for [him].[11]

Green Leaves and Cheah argue that Audrey Wong (the landlord's managing agent) knew Cheah was "the president of the corporation, the major shareholder, and in charge," and that Yu told her that he was not supposed "to do anything." [12] But the circumstances after the fire, including Cheah's prolonged inaction, forced Yu to take an active role and to deal with the landlord himself in order to stanch his

---

**8.** *Id.* at 1154 (citing *Newbold v. Brennan Constr. Co.*, 48 App. D.C. 90, 94–95 (1918)); *see also Hodge v. Evans Fin. Corp.*, 262 U.S.App. D.C. 151, 160, 823 F.2d 559, 568 (1987).

**9.** "Whether an agent had apparent authority is a question of fact, and the party asserting the existence of apparent authority must prove it." *Makins v. District of Columbia*, 861 A.2d 590, 594 (D.C.2004) (en banc). At the parties' behest, the motions judge decided this factual issue on the basis of the deposition testimony, affidavits and exhibits submitted by the parties and the representations and argument of counsel. Although Green Leaves and Cheah argue on appeal that the judge should have taken additional testimony, they did not make that request below.

**10.** *Id.* (internal quotation marks omitted).

**11.** *Id.* (citation and internal quotation marks omitted).

**12.** Brief of Appellants (Green Leaves and Cheah) at 19–20 (citing Wong's deposition testimony).

(and the other guarantors') escalating liability. By itself, Cheah's contrasting failure to come forward and exercise responsibility could have been taken to mean that authority in the corporation had shifted to Yu. But whether or not that was so, Cheah unambiguously conveyed his consent to Yu's assumption of authority to act on Green Leaves's behalf by the way he reacted to 617 H Street Associates' complaint for damages.

The landlord initially served its complaint only on Green Leaves (by its registered agent) and Cheah; Yu and Lee were not served until many months later. Green Leaves failed to answer the complaint. In other words, notwithstanding his position as president, director and principal shareholder, Cheah took no action on behalf of the corporation and allowed it to default. Moreover, in the answer and cross-claims he filed for himself, Cheah alleged that Green Leaves was under the "stewardship" of Yu and Lee, and that he himself was only "a passive investor" in the corporation. According to Cheah's pleading, "Yu and Lee managed the day-to-day affairs of the restaurant and were responsible for all matters attendant thereto, including but not limited to maintaining all insurance coverage *and otherwise abiding by all terms of the Lease Agreement.*" (Emphasis added.) Cheah denied any responsibility of his own; he professed ignorance of any actions taken by Yu and Lee respecting the payment of rent, the procurement of insurance, and the repair of the fire-damaged premises; and he asserted that he did not even know whether the rent had been paid or what rent would be due in the future under the lease.

In addition, as a further defense, Cheah alleged that 617 H Street Associates had failed to mitigate its damages. That defense could have meant only one thing: that Cheah wanted the landlord to cut its losses by repossessing the property and re-leasing it to another, paying tenant.[13]

The implication of Cheah's statements and his own failure to act for Green Leaves was that Yu and Lee were vested with that authority; and, further, that Cheah consented to their entering into a settlement agreement on behalf of Green Leaves pursuant to which the landlord would mitigate its damages by taking back the property and renting it to another tenant. Audrey Wong thus had every reason to credit Yu's sworn averment, when he appeared in landlord and tenant court in response to the complaint for possession, that he was authorized to enter into a binding agreement on Green Leaves's behalf.[14] Accordingly, we hold that the judge did not err in denying Green Leaves's and Cheah's motion to vacate the settlement agreement.[15]

---

13. When a tenant defaults on a lease, the landlord's duty to mitigate is satisfied when he attempts to re-let the property. *See* MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 16:3.1, 16–42 (Patrick A. Randolph, Jr., ed., 5th ed. 2009) (hereinafter, "FRIEDMAN ON LEASES"). The duty to mitigate by re-letting arises when the landlord obtains a judgment for possession or otherwise recovers the property. *D.W.S. Washington Holdings, Inc. v. Jackson,* 739 F.Supp. 19, 22 (D.D.C.1990) ("Until the landlord has a judgment of possession and the tenant is in fact evicted the landlord simply cannot guarantee to any prospective tenant that the premises will be available for occupancy.").

14. It is true that Yu and Lee asserted in *their* cross-claims that "Michael Cheah was solely in charge of the management of the corporation." However, they did not file their cross-claims until September 2003, five months *after* Yu signed the settlement agreement for Green Leaves.

15. In light of our holdings with respect to Yu's actual and apparent authority to enter into the settlement agreement, Cheah's argu-

## IV. Effect of the Settlement Agreement on Cheah's Liability as a Guarantor

■ Cheah argues that the settlement agreement between Green Leaves and 617 H Street Associates materially altered the lease without his consent, thereby discharging him from liability on his guaranty of the lease as a matter of law. We disagree.

■ "[I]t is well settled that a material or substantial alteration of a guaranteed contract without the guarantor's consent serves to discharge him from liability on his guaranty."[16] As Cheah concedes, courts generally hold that "an alteration in the obligation or duty guaranteed will release the guarantor only if it is material and substantial and prejudicial to his or her rights."[17] There was no such alteration here.

■ When Yu executed the settlement agreement in April 2003, Green Leaves was in default on its payment obligations under the lease, having failed to pay some $152,000 in rent (not to mention the unpaid business taxes and repair costs). The default provision in the lease gave the landlord the unconditional right to terminate the lease and the tenant's possession of the premises, and thereafter to sue the tenant for damages caused by its breach.[18] The lease further provided that any efforts by the landlord to mitigate its damages, such as re-letting the premises, would not constitute a waiver of the landlord's right to recover damages from the tenant.[19] Thus, to the extent the settlement agreement merely allowed 617 H Street Associates to terminate the lease and take possession of the premises, it did not alter the terms of the lease; it implemented them. The surrender of possession and termination of the lease pursuant to the settlement agreement therefore did not operate to discharge Cheah from his liability as a guarantor of the tenant's lease obligations.[20] It likewise did not prejudice Cheah or de-

ments that the landlord did not furnish proper notice to quit or properly serve the complaint for possession are moot.

16. *Hollywood Credit Clothing Co., Inc. v. Thompson*, 110 A.2d 536, 537 (D.C.1955).

17. 38A C.J.S. Guaranty § 94 (2008); *accord* RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY §§ 39–41 (1996); *see, e.g., Sonne v. Federal Deposit Ins. Corp.*, 881 S.W.2d 789, 793–94 (Tex.App.1994) (prejudice and materiality are required for release of sureties); *Phil & H. Quinto, Inc. v. Stein*, 123 Pa.Super. 109, 186 A. 280, 281 (1936) (substantial, material change with prejudice is required for release of guarantor).

18. Paragraph 19 of the lease, captioned "Default," reads in pertinent part as follows:

If Tenant fails to make any payment required by the provisions of this Lease, when due, without prior notice or demand or grace period ..., Landlord shall have the right at any time thereafter to elect to terminate said Lease and Tenant's right to possession thereunder. Upon such termi-

nation, Landlord shall have the right to recover against Tenant:

a. The worth at the time of award of the unpaid rent which had been earned at the time of termination; ... and

d. Any other amount necessary to compensate the Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under the Lease or which in the ordinary course of things would be likely to result therefrom.

19. Paragraph 19 states in pertinent part as follows:

Such efforts as Landlord may make to mitigate the damages caused by Tenant's breach of this Lease shall not constitute a waiver of Landlord's right to recover damages against Tenant hereunder.... In the event of a default by Tenant resulting in the eviction of Tenant, Landlord shall take reasonable steps to relet the premises and to mitigate foreseeable damages.

20. *See, e.g., American Bonding Co. of Baltimore v. Pueblo Inv. Co.*, 150 F. 17, 22 (8th

prive him of any rights; given his failure to take responsibility for the rent arrearage and the repair of the property, Cheah cannot claim that the settlement deprived him of the benefits of his investment. If anything, the settlement eliminated Cheah's open-ended exposure to much greater liability as a guarantor of Green Leaves's on-going obligation to pay rent and future business taxes under a lease that still had years to run.[21]

Cheah contends, however, that the settlement extinguished his liability as a guarantor because, in addition to allowing the landlord to terminate the lease and re-

take possession upon Green Leaves's failure to cure its default, the agreement released Green Leaves from any residual liability to 617 H Street Associates for back rent and other monetary damages following its recovery of the premises. While the agreement does not release Green Leaves explicitly, it can be so construed.

■■■ Cheah invokes the general rule that, to avoid unfairness to the principal obligor and its guarantors, "where the creditor releases a principal, thereby discharging the principal debt, the guarantor is likewise relieved of liability."[22] Howev-

---

Cir.1906) ("The surrender of the premises by the lessees and the acceptance of the property by the lessor, after the defaults of the former, were acts in exact accordance with, and in the performance of the terms of the guarantied lease. They worked no alteration or modification of that contract, and for that reason they did not release the surety."); *Pinchot v. Roskam*, 123 Misc. 253, 204 N.Y.S. 782, 783 (1924) ("The termination agreement, which involved merely a surrender and acceptance of the premises prior to the expiration of the lease, did not result in a discharge of the defendant Roskam, the guarantor, as to rent already accrued, as to which his liability was in no way changed."); *Heydecker v. Hoffman*, 75 Misc. 476, 133 N.Y.S. 436, 437 (1912) (agreement to terminate lease "did not operate to release [guarantors] from their obligation to pay rent which had accrued prior to that time"); *Bothfeld v. Gordon*, 190 Mass. 567, 77 N.E. 639, 640–41 (1906) ("[I]nstead of forcing the lessors to make a formal entry into the premises the tenant [in default] consented to surrender the estate.... In a word, the term was ended substantially as it was provided [in the lease] that it should be ended; and the consent of the defendant, the guarantor, to such an ending must be presumed.... The obligation to pay the past rent was not changed by the surrender, and the liability of the defendant [guarantor] to pay it, which prior to the surrender had become fixed, continued notwithstanding the termination of the lease."); *cf. Northern Ind. Steel Supply Co., Inc. v. Chrisman*, 139 Ind.App. 27, 204 N.E.2d 668, 674 (1965) (when lessor accepted lessee's surrender of the property and

terminated lease, guarantor was "released from liability on the lease ... as of the date of termination" and did not have to pay for liability that accrued after the termination). *See also* Friedman on Leases § 35:3, at 35–12 to 35–13.

21. For the same reasons, we agree with the trial judge's summary rejection of Cheah's claim that Yu breached his fiduciary duties to him and to Green Leaves by conspiring with the landlord to terminate the lease and deprive him of his opportunity to benefit from his investment so that Yu's father could take over the premises. Under the circumstances, we perceive no breach of fiduciary duty on Yu's part. (Cheah complains in his brief that the trial court improperly granted summary judgment against him on his conspiracy and breach of fiduciary duty claims before he had concluded discovery. As Cheah does not describe the discovery he sought or any discovery ruling to which he objects, we deem the claim forfeited. *See Television Capital Corp. of Mobile v. Paxson Commc'ns Corp.*, 894 A.2d 461, 468–69 n. 5 (D.C.2006).)

22. *Knight v. Cheek*, 369 A.2d 601, 603 (D.C. 1977); *accord, Allen v. Yates*, 870 A.2d 39, 45 (D.C.2005). The rationale for this rule is twofold. On the one hand, the release of the principal obligor would be illusory if the guarantors were not relieved of liability to the creditor and could seek indemnity from the principal for their performance of its obligations. "As Chancellor Mellish stated over 100 years ago, 'it would be a fraud on the

er, there is (as, practically speaking, there must be) a way for a creditor to release the principal obligor without losing its right to proceed on its guarantees. Our court has followed the traditional common law rule that a creditor may preserve its rights against the guarantors by the simple expedient of reserving those rights expressly in its release of the principal debtor.[23] As explained in the American Law Institute's most recent Restatement of the law of suretyship and guaranty:

> Under this so-called "reservation of rights" doctrine, two consequences followed from the mere act of informing the principal obligor that the obligee was reserving rights against the secondary obligor in conjunction with conduct that would otherwise impair the secondary obligor's recourse. First, by reserving rights against the secondary obligor, the obligee preserved all rights of the secondary obligor as though the conduct had never occurred.... Second, by reserving rights against the secondary obligor, the obligee prevented discharge of the secondary obligor based on the conduct of the obligee because, according to the doctrine, the preservation of the secondary obligor's rights as though the conduct had not occurred resulted in that conduct causing the secondary obligor no harm.[24]

The reservation of rights is deemed to put the principal obligor on notice that it will remain liable to indemnify its guarantors.

In the present case, the obligee followed the traditional method of protecting its rights against the guarantors while releasing the principal debtor. In its settlement agreement with Green Leaves, 617 H Street Associates reserved its rights to "seek judgement [*sic*] against any officer of Green Leaves Restaurant, Inc. pursuant to the lease agreement." Thus, if we adhere to the traditional rule, the settlement agreement did not extinguish Cheah's obligations as a guarantor.

The traditional "reservation of rights" doctrine has been criticized, however, among other reasons, on the ground that an unsophisticated debtor would be unlikely to realize that a creditor's mere "incantation of a 'reservation of rights'" in a release preserves the debtor's liability to its secondary obligors.[25] Responding to the criticisms, the RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY departs from the traditional rule and proposes stricter requirements for avoiding the discharge of secondary obligors in a release of the principal debtor. In pertinent part, Section 39 ("Release of Underlying Obligation") of the Third Restatement provides as follows:

> To the extent that the obligee releases the principal obligor from its duties pursuant to the underlying obligation:
>
> (b) the secondary obligor is discharged from any unperformed duties pursuant to the secondary obligation unless:

principal debtor to profess to release him, and then to sue the surety, who would in turn sue him.'" RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY, Introductory Note to §§ 39–41 (quoting *Nevill's Case*, (1870) 6 Ch.App. 43, 47 (U.K.), *available at* http://books.google.com/books?id=QuAwAAAAIAAJ.). On the other hand, the guarantors would be prejudiced if the principal obligor's release eliminated their rights to seek full indemnity without discharging their own liability as well.

23. *See Knight*, 369 A.2d at 603 (citing RESTATEMENT OF SECURITY § 122 (1941)); *see also Allen*, 870 A.2d at 45–46.

24. RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 38 cmt. a.

25. *Id.*

(i) the terms of the release effect a preservation of the secondary obligor's recourse (§ 38); [26] or

(ii) the language or circumstances of the release otherwise show the obligee's intent to retain its claim against the secondary obligor;

(c) if the secondary obligor is not discharged from its unperformed duties pursuant to the secondary obligation by operation of paragraph (b), the secondary obligor is discharged from those duties to the extent:

(i) of the value of the consideration for the release;

(ii) that the release of a duty to pay money pursuant to the underlying obligation would otherwise cause the secondary obligor a loss; and

(iii) that the release discharges a duty of the principal obligor other than the payment of money; . . . . [27]

Application of these provisions of Section 39 would not result in Cheah's discharge. The settlement agreement between Green Leaves and 617 H Street did not expressly state that the guarantors would retain their rights of recourse against Green Leaves. Hence it did not satisfy the exception from discharge set forth in subparagraph (b)(i).[28] Nonetheless, by stating the landlord's intent to retain its claims against Cheah and the other guarantors, the agreement satisfied

subparagraph (b)(ii). Cheah thus was not discharged by operation of paragraph (b).

That leaves paragraph (c) to consider. Cheah has not argued that he meets the conditions for discharge set forth in paragraph (c), and we cannot conclude that he does. While subparagraph (c)(i) would credit Cheah with the value of any consideration paid by Green Leaves for the release, the only consideration Green Leaves "paid" was its surrender of the premises. That surrender, in conjunction with the landlord's consequent ability to re-let the property to another tenant, reduced the landlord's post-termination damages (e.g., loss of *future* rent for the remaining term of the lease); so far as appears from the record, however, it did not reduce the landlord's pre-termination damages (e.g., the unpaid back rent).[29] The surrender and re-letting therefore did not reduce the guarantors' liability for pre-termination damages. Subparagraph (c)(iii) is likewise inapplicable to the present facts: while Green Leaves presumably was released from both its monetary and non-monetary obligations, Cheah and the other guarantors were adjudged liable to 617 H Street Associates only for the monetary obligations (back rent, business taxes, and attorney's fees).

Lastly, subparagraph (c)(ii) would discharge Cheah from liability only to the extent that the release of Green Leaves

---

**26.** Section 38 provides that a release "effects a 'preservation of the secondary obligor's recourse'" by stating expressly that:
(a) the obligee retains the right to seek performance of the secondary obligation by the secondary obligor; *and*
(b) the rights of the secondary obligor to recourse against the principal obligor ... continue as though the release ... had not been granted.
RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 38(1) (emphasis added).

**27.** *Id.* § 39.

**28.** *See id.* § 38(1); *see also id.* § 39 cmts. b, c & illustration 1.

**29.** It is not suggested that the monthly rent paid by the substitute tenant exceeded the monthly rent that Green Leaves would have owed in the same period, had its lease not been terminated. *Cf. Truitt v. Evangel Temple, Inc.,* 486 A.2d 1169, 1173–74 (D.C.1984) (holding that landlord's damages must be reduced by any profit it obtains on new lease).

and the consequent extinguishment of Cheah's recourse against Green Leaves actually caused him a loss. That he has not shown, and it does not appear to be the case. So far as appears, Green Leaves was insolvent following the fire, and it permanently ceased doing business. Even if Green Leaves had not been released from its debt to the landlord, Cheah would have been unable to look to it for reimbursement. The release therefore cost him nothing.[30] (Furthermore, of course, the release of Green Leaves did not impair Cheah's rights of contribution against Yu and Lee.)

Thus, whether we follow the traditional "reservation of rights" doctrine or the approach of the Third Restatement, we conclude that the release of Green Leaves did not discharge Cheah from his obligations as a guarantor of the lease.

## V. Attorney's Fees

■ Cheah, Yu and Lee challenge the trial judge's award of $21,495.51 in attorney's fees to 617 H Street Associates. We are not persuaded to disturb it. The judge's factual finding that the fees claimed by the landlord were reasonable was neither unsupported by the evidence nor plainly wrong,[31] notwithstanding the landlord's own admitted dissatisfaction with one of its lawyers. Contrary to the guarantors' principal contention, we conclude that they are liable under the lease for reasonable attorney's fees incurred by the landlord in suing them to enforce their guaranties. Paragraph 19 of the lease contains the following specific provision:

> Should Landlord at any time terminate this Lease for any breach, in addition to any other remedies it may have, it may recover from Tenant *all damages it may incur by reason of such breach, including* the cost of recovering the premises and *reasonable attorney's fees,* all of which amounts shall be immediately due and payable from Tenant to Landlord. (Emphasis added.)

Under this provision, which we consider to be unambiguous and construe as a matter of law,[32] *the tenant* is liable to the landlord for "all" damages, including all reasonable attorney's fees, incurred by the landlord "by reason of" the tenant's breach. The attorney's fees incurred by the landlord to recover its damages from the guarantors of the lease fall within this category.[33] As guarantors, Cheah, Yu and Lee accepted "personal responsibility and liability" for all the tenant's payment obligations under the lease, including, a fortiori, this one. While the landlord may have released Green Leaves itself from this payment obligation in the settlement agreement, that did not discharge the guarantors from

---

**30.** As the comment to Section 39(c)(ii) of the Third Restatement explains:

[T]he lack of recourse by the secondary obligor against the principal obligor resulting from the release often will not cause the secondary obligor to suffer a loss. If the principal obligor has little or no assets at the time of the release, for example, and there is no collateral for the underlying obligation or the duty to reimburse, it is likely that the secondary obligor would not have obtained any recovery from the principal obligor even in the absence of the release.

*Id.* § 39 cmt. f. *See also id.* illus. 7.

**31.** *See* D.C.Code § 17–305(a) (2001).

**32.** *See, e.g., Steele Founds., Inc. v. Clark Constr. Group, Inc.,* 937 A.2d 148, 153 (D.C. 2007)

**33.** *Cf. Norris v. Green,* 656 A.2d 282, 288 (D.C.1995) (landlord is entitled to recover expenses incurred in mitigating damages from breach of lease); *Lennon v. U.S. Theatre Corp.,* 287 U.S.App. D.C. 202, 206, 920 F.2d 996, 1000 (1990) (same); *Wilson v. Ruhl,* 277 Md. 607, 356 A.2d 544, 548 (1976) (same).

their liability for the reasons discussed above.

## VI. Rights of Contribution Among the Three Guarantors

Rejecting the guarantors' demands for equitable indemnification from each other as unwarranted, the trial court adjudged them liable to each other for contribution in the amounts necessary to equalize each guarantor's out-of-pocket payment. Accordingly, the court ruled that Cheah, Yu and Lee were each liable inter se for one-third of the damages (back rent, business taxes and attorney's fees) awarded to 617 H Street Associates, and that Cheah owed Yu and Lee one-third of the $158,000 they had expended for repairs.[34] Our review of the court's rulings on indemnification and contribution is de novo.[35] We affirm the denial of indemnification. We remand, however, for the court to consider whether the guarantors' liability for contribution should be in proportion to their ownership interests in Green Leaves.

To obtain full indemnification, a guarantor usually must look to the principal obligor whose debt the guarantor has discharged. The guarantor's right to reimbursement from the principal obligor is contractual; "[e]ven in the absence of express agreement, an implied contract to reimburse in these circumstances arises when the contract of guaranty is made." [36] A comparable contractual obligation to indemnify is not implied between or among guarantors. Instead, "cosureties are treated as though they agreed among themselves to share the cost of their performance," [37] and a guarantor who has paid more than his proportionate or fair share of the guaranteed debt therefore is entitled only to contribution (but not full reimbursement) from the other guarantors.

In the absence of a contractual obligation, a duty to indemnify grounded in equity may be found to exist if full reimbursement (rather than proportionate contribution) "is required to prevent injustice." [38] This situation arises when the indemnitor is significantly more "blameworthy" than the indemnitee.[39] In this

---

**34.** In light of some ambiguous statements in the trial court's decision, and for the sake of clarity, it should be emphasized that the guarantors' liability to each other for contribution or indemnification does not affect their individual liability to 617 H Street Associates for the entire amount of the damages award. "With respect to the obligee, each cosurety is liable to the full extent of its secondary obligation." RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 57 cmt. a.

**35.** *Hubbard v. Chidel*, 790 A.2d 558, 570 (D.C. 2002) ("Like equitable indemnification issues, we review questions of contribution *de novo*.").

**36.** *Knight*, 369 A.2d at 603. As the Third Restatement explains:

When the principal obligor is charged with notice of the secondary obligation, the duty to reimburse, like the principal obligors duty to perform, arises from implied contract. Just as the principal obligor impli-

edly agrees that it will perform the underlying obligation so that the secondary obligor will not have to perform, the principal obligor also agrees that it will reimburse the secondary obligor to the extent that the secondary obligor does perform, thereby fulfilling all or part of the underlying obligation.

RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 22 cmt. a.

**37.** *Id.* § 57 cmt. a.

**38.** *R & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin*, 596 A.2d 530, 544 (D.C. 1991); *see also District of Columbia v. Washington Hosp. Ctr.*, 722 A.2d 332, 340 n. 9 (D.C.1998) (noting that equitable indemnification "has been granted to prevent unjust enrichment").

**39.** *Washington Hosp. Ctr.*, 722 A.2d at 340; *see also East Penn Mfg. Co. v. Pineda*, 578 A.2d 1113, 1127 n. 20 (D.C.1990) (explaining

case the trial judge found insufficient equitable justification to deviate from the general rule of contribution among cosureties by ordering Yu and Lee to indemnify Cheah or vice versa. We cannot disagree with the judge's evaluation. Cheah claims he depended on Yu and Lee to run Green Leaves's restaurant for him,[40] while Yu and Lee claim they relied on Cheah in light of their own lack of business experience and acumen. The fact remains that the three guarantors failed to communicate and clarify their roles and responsibilities, and all three were inattentive to their new business. Each one neglected the obligation he or she personally assumed by becoming a guarantor to ensure that Green Leaves obtained adequate fire insurance coverage for the leased premises. The guarantors never conferred about what insurance coverage was needed, how it would be obtained, or who would purchase it. They did nothing to check whether the requisite insurance was in place. Thus, we readily agree with the trial court that all the guarantors were at fault, regardless of their lack of sophistication or their involvement in other activities. The record does not compel a finding that any guarantor was significantly less at fault than another. We therefore uphold the trial court's determination not to order equitable indemnification.

■ Contribution is governed by equitable principles,[41] subject to any express or implied agreements between or among the parties sharing the liability. "[W]here the parties have a contract governing an aspect of the relation between themselves, a court will not displace the terms of that contract and impose some other [equitable] duties not chosen by the parties."[42] Accordingly, "[a]s a general rule a guarantor who has paid more than his or her proportionate share of the debt guaranteed may obtain from his or her coguarantors contribution of an amount sufficient to make the payment of all equal or sufficient to satisfy the requirements of an agreement fixing the relative liability of the guarantors."[43]

In ordering equal contribution in this case, the trial judge followed the general equitable rule of equal contribution among equally situated co-obligors. However, it appears the judge did not consider the implications of the guarantors' unequal relations to each other as co-owners of Green Leaves. Courts in other jurisdictions have

---

that the equitable obligation to indemnify "is based on variations in the relative degrees of fault").

40. As previously mentioned, Cheah also claims that Yu's father had promised him he would maintain the restaurant's fire insurance coverage. Yu's father (who was not an investor or employee of Green Leaves) did not testify, and the circumstances of his alleged involvement were never clarified. Cheah admittedly did not discuss his reliance on Yu's father with Yu or Lee. Without more, such reliance does not entitle Cheah to indemnification by his fellow guarantors.

41. Contribution is an equitable remedy grounded on the precept that "a party who discharges a liability shared with another should not bear the sole obligation for pay-

ment." *George Washington Univ. v. Bier*, 946 A.2d 372, 375 (D.C.2008) (citation omitted).

42. *Emerine v. Yancey*, 680 A.2d 1380, 1384 (D.C.1996).

43. 38A C.J.S. Guaranty § 161; *see, e.g., Spottiswoode v. Levine*, 730 A.2d 166, 172 (Me. 1999) ("A co-guarantor who has paid more than its share is entitled to demand contribution from each of the others for an aliquot part of the entire debt, and to maintain suit to enforce the right to contribution."); Restatement (Third) of Suretyship & Guaranty § 57(1) ("Subject to ... any express or implied agreement between or among the cosureties, a cosurety's contributive share is the aggregate liability of the cosureties to the obligee divided by the number of cosureties.").

held that "[s]ince the right to contribution is inherently equitable in nature, the rule logically follows that where co-obligors have received unequal benefits from the common obligation, the portion of the contribution that each must bear is according to the benefits that each has received."[44] This equitable principle appears applicable here. Because Cheah owned half of the company, while Yu and Lee each had only a quarter share, they stood to benefit unequally from their common assumption of Green Leaves's lease obligations: had the enterprise been successful, Cheah's share of the profits would have been twice that of Yu or Lee. Similarly, if Green Leaves had been able to pay its debts itself or indemnify its guarantors, Cheah, Yu and Lee would have borne the loss in proportion to their shareholdings. Considerations of fairness suggest that the guarantors therefore should contribute to the common liability in proportion to their ownership interests, rather than equally.[45]

Moreover, an implied agreement among guarantors of a corporate debt to contribute in proportion to their shareholdings may be inferred from "the general rela-

tionship among the cosureties or ... the circumstances surrounding the particular suretyship transaction."[46] The Restatement offers an illustration that is directly on point:

> To induce C to lend D Corporation $ 3,000, S[1], S[2], and S[3] agree to be cosureties with respect to this debt. S[1], S[2], and S[3] enter into no express agreement as to their contributive shares. S[1], S[2], and S[3] are the sole shareholders of D Corporation; S[1] owns 50 percent of the shares, S[2] owns 30 percent of the shares, and S[3] owns 20 percent of the shares. D defaults having paid none of the debt, with the result that S[1], S[2], and S[3] are liable to C for a total of $ 3,000. The fact finder may find an implied agreement that the cosureties' contributive shares are to be in proportion to their ownership interests.[47]

Given the fact-dependent nature of both the equitable inquiry and the inference of an implied agreement, we decline to decide the question of the guarantors' contributive shares in the first instance. We recognize that there might be equitable con-

---

**44.** *Reliance Group Holdings, Inc. v. Nat'l Union Fire Ins. Co.*, 188 A.D.2d 47, 594 N.Y.S.2d 20, 26 (N.Y.App.Div.1993) (citation omitted); *accord Spottiswoode*, 730 A.2d at 172–73; *Bossard v. Sullivan*, 206 Mont. 392, 670 P.2d 1389, 1391 (1983); *In re Estate of Egeland*, 741 N.W.2d 724, 727 (N.D.2007); *Kahn v. Weldin*, 60 Or.App. 365, 653 P.2d 1268, 1274 (1982); 38A C.J.S. Guaranty § 161.

**45.** *See, e.g., Brown v. Goldsmith*, 437 P.2d 247, 248 (Okla.1968) (holding that, where shareholders have guaranteed corporate indebtedness, "[i]t is only equitable that the burden of the obligation be borne by [each shareholder-guarantor] in proportion to the amount of his ownership of stock in the corporation"); *Maresh v. Jennings*, 38 S.W.2d 406, 407–08 (Tex.Civ.App.1931) (when bank became insolvent, equitable contributions of bank shareholders for debts should be "commensurate with and in proportion to the ben-

efits flowing to each of the [shareholders]" because "equity demands ... that he who received the greater benefit from the contract should bear the burden proportionate to his benefits"); *but see Brooke v. Boyd*, 80 Wash. 213, 141 P. 357, 358 (1914).

**46.** RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 57 cmt. c. "[A]n implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *Vereen v. Clayborne*, 623 A.2d 1190, 1193 (D.C.1993) (internal quotation marks and citation omitted).

**47.** RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 57 illus. 4.

siderations or understandings among the guarantors, of which we are unaware, that the parties could identify and the trial court should take into account. We therefore direct the court on remand to revisit the matter and determine whether Cheah, Yu and Lee should contribute equally or in proportion to their ownership interests in Green Leaves.

## VII. Conclusion

For the foregoing reasons, we remand this case to the Superior Court for (1) redetermination of the guarantors' liability for contribution among themselves, and (2) determination of the exact amount of back rent for which the guarantors are liable to 617 H Street Associates. In all other respects, we affirm.