OPINION OF THE COURT
Marcy S. Friedman, J.
In this action for alleged breach of an insurance contract, plaintiff Millennium Partners, L.R, sues its insurer, defendant Select Insurance Company, to recover defense costs that Millennium paid in connection with the settlement of public investigations against it for “market timing” of mutual funds. Millennium incurred defense costs of over $19 million, but seeks reimbursement up to the policy limit of $10 million. Defendant Select moves for summary judgment dismissing Millennium’s complaint.
Millennium is a private investment partnership, commonly known as a “hedge fund,” which had more than $5 billion of investors’ money under management as of the date of the settlements. (See complaint ¶ 1 [exhibit A to Select’s motion]; aff of Simon Lome [Millennium’s chief legal officer] ¶ 12.) Millennium purchased from Select a mutual fund and directors and officers errors and omissions liability insurance policy (the policy) (exhibit E to Select’s motion), covering the period from December 17, 2002 to December 17, 2003. The policy covered losses of up to $10 million for all claims that were first made during the policy period. (Id., item 3.) As defined in the policy:
“ ‘Loss’ means that amount, including Defense Costs, which the Insured (s) or the Insured Company shall become legally obligated to pay or for which the Insured Company legally indemnifies the Insured (s) as a result of a Claim first made against the Insured (s) and/or the Insured Company during the Policy Period . . . provided, however, that Loss shall not include . . . punitive or exemplary damages, criminal or civil fines or penalties imposed by law ... or matters uninsurable under the law pursuant to which this Policy is construed.” (Id. § II [E].)
“ ‘Defense Costs’ means that part of Loss consisting of costs, charges and expenses incurred in the defense of Claims.” (Id. § II [B].)
“ ‘Claim’ means any judicial or administrative proceeding . . . against (1) the Insured Company or any Insured (s) for a Wrongful Act as a result of *214 which the Insured Company or such Insured (s) may be subjected to a binding adjudication of liability for damages or other relief.” (Id. § II [A].)
It is undisputed that in July and September 2003, respectively, the Attorney General of the State of New York (NYAG) and the Securities and Exchange Commission (SEC) commenced investigations into Millennium’s trading practices relating to market timing and late trading of mutual funds. (See complaint ¶ 17.) In November 2005, the SEC and the NYAG both advised Millennium that it would be charged with state and federal securities laws violations for fraudulent market timing practices. (See Lome aff ¶¶ 11, 12.) In order to resolve the contemplated proceedings, Millennium entered into settlement agreements in which it consented to the entry of an SEC “Order Instituting Administrative and Cease-and-Desist Proceedings” (SEC order) (86 SEC Docket 1889, 2005 WL 3240598, 2005 SEC LEXIS 3078 [2005]) and to the entry of an “Assurance of Discontinuance” with the NYAG (NYAG discontinuance) (available at http:// www.oag.state.ny.us/media_center/2005/dec/AOD.pdf, cached at http://www.nycourts.gov/reporter/webdocs/AOD.pdf [accessed Apr. 2, 2009]) (exhibits C and D to Select’s motion).
The SEC order made factual findings based on Millennium’s settlement offer. (See SEC order ¶ III, 2005 WL 3240598, *2, 2005 SEC LEXIS 3078, *3.) These findings included the following: “From at least 1999 to 2003, Millennium . . . generated tens of millions of dollars in profits through market timing trades of mutual fund shares, a practice which mutual funds generally discouraged.” (SEC order ¶ III [9], 2005 WL 3240598, *3, 2005 SEC LEXIS 3078, *6-7.) Millennium “devised and carried out a fraudulent scheme to avoid detection and circumvent restrictions that the mutual funds imposed on market timing” in which it
“(1) created approximately 100 legal entities to hide that Millennium was behind the mutual fund trading; (2) used those entities to create in excess of 1,000 accounts; (3) structured its trading to avoid detection by the mutual funds; (4) used omnibus accounts and variable annuities to further hide Millennium’s identity; and (5) took advantage of certain ‘sticky’ asset arrangements.” (SEC order ¶ III [9], 2005 WL 3240598, *3, 2005 SEC LEXIS 3078, *7.)
The SEC order concluded that Millennium’s conduct violated section 17 (a) of the Securities Act of 1933 (15 USC § 77q [a]) *215 and section 10 (b) of the Securities Exchange Act of 1934 (15 USC § 78j [b]) and rule 10b-5 (17 CFR 240.10b-5). (SEC order ¶ III [27], [28], 2005 WL 3240598, *8, 2005 SEC LEXIS 3078, *22-24.)[1] The NYAG discontinuance adopted as findings similar allegations contained in the NYAG’s proposed complaint, and concluded that Millennium’s acts violated the Martin Act (General Business Law art 23-A), section 349 of the General Business Law, and Executive Law § 63 (12). (See NYAG discontinuance at 1, 4.)
Under the SEC order, Millennium agreed to certain remedial measures and to pay “$148 million in disgorgement.” Millennium’s principals also agreed to pay substantial civil penalties. (SEC order ¶ IV [J], 2005 WL 3240598, *14, 2005 SEC LEXIS 3078, *38-39.) The NYAG discontinuance provided for the same $148 million payment by Millennium “in disgorgement and restitution” and the same civil penalties. (NYAG discontinuance at 5.)
Both the SEC order and the NYAG discontinuance provided that Millennium’s consent to the relief was “without admitting or denying the findings” of the SEC or the NYAG. (SEC order ¶ II, 2005 WL 3240598, *1, 2005 SEC LEXIS 3078, *2-3; NYAG discontinuance at 4.) In the NYAG discontinuance, Millennium also expressly agreed not to seek reimbursement or indemnification from its insurer for any of the amounts payable under the settlement. (See NYAG discontinuance at 6.)
Prior to the commencement of this action, Millennium requested reimbursement from Select of the legal fees and expenses that Millennium had paid as a result of the investigations. (See complaint ¶ 29.) By letter sent on or about August 15, 2005, Select denied liability for loss resulting from the claims involved. (See id. ¶ 31.)
In the instant action, Millennium does not claim that Select is obligated to reimburse it for the payments it made for dis *216 gorgement and contends only that Select is obligated to reimburse it for the reasonable and necessary legal fees and expenses “incurred in connection with the Investigations and in defense of claims arising therefrom,” up to its policy maximum of $10 million. (Complaint ¶ 35.) Select contends that Millennium is not entitled as a matter of law to recover its defense costs because these costs were incurred in connection with claims that are not covered by the policy. More particularly, Select contends that the claims were for, and the settlements required, disgorgement of improperly acquired funds; that sums paid for disgorgement are losses uninsurable by law; and that the losses are therefore subject to the policy exclusion. In opposition, Millennium argues that there is a triable issue as to whether the settlement amounts for disgorgement in fact represented improperly acquired funds.
It is well settled that an exclusionary clause in an insurance policy is to be given a strict and narrow construction. (Seaboard Sur. Co. v Gillette Co., 64 NY2d 304 [1984].) In order for an insurer “[t]o negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.” (Continental Cas. Co. v Rapid-American Corp., 80 NY2d 640, 652 [1993]; Incorporated Vil. of Cedarhurst v Hanover Ins. Co., 89 NY2d 293 [1996].)
It is further settled “that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired.” (Reliance Group Holdings v National Union Fire Ins. Co. of Pittsburgh, Pa., 188 AD2d 47, 55 [1st Dept 1993] [internal quotation marks omitted], lv dismissed in part and denied in part 82 NY2d 704 [1993]; accord Shapiro v OneBeacon Ins. Co., 34 AD3d 259 [1st Dept 2006].) As explained in Vigilant Ins. Co. v Credit Suisse First Boston Corp. (10 AD3d 528, 528-529 [1st Dept 2004]) disgorgement of “ill-gotten funds is not insurable under the law” because such disgorgement “does not constitute ‘damages’ or a Toss’ as those terms are used in insurance policies.” Moreover, where defense costs are a component of uninsurable loss, a party may not be reimbursed for those costs as they “are only recoverable for covered claims.” (Id. at 529.)
In support of its motion, Select contends that Vigilant is controlling because, under similar facts, the Court held that the defense costs were uninsurable as a matter of law. In Vigilant, *217 Credit Suisse First Boston (CSFB) was investigated by the SEC and NASD Regulation, Inc. for obtaining commissions for “flipping” initial public offering stock in violation of federal securities laws. CSFB entered into a settlement with both entities in which it agreed to pay $70 million in disgorgement of improperly acquired funds. The Court held that CSFB was not entitled to recover either the disgorged funds or the defense costs incurred by reason of the regulatory investigation because these amounts were not insurable losses under the policy.
Millennium’s efforts to distinguish Vigilant are unavailing. The policy provisions here and in Vigilant are virtually identical. Both define “Loss” as including defense costs but not matters uninsurable under governing law. The reasoning of Vigilant — that disgorgement of improperly acquired funds is not a covered loss, and that defense costs in connection with a claim for disgorgement are therefore also not a covered loss — is equally applicable here.
In so holding, the court rejects Millennium’s contention that a triable issue of fact exists as to whether the amount it was required to disgorge in its settlement agreements represented improperly acquired funds. Millennium argues that in Vigilant, unlike the instant case, the settlement provided for a final judgment which eliminated any issues as to the nature of the disgorged funds by expressly stating that the money ordered to be disgorged was “obtained improperly by CSFB as a result of the conduct alleged in the Complaint.” (Vigilant, 10 AD3d at 529 [quoting judgment].)
Millennium correctly argues that the provisions of the Millennium settlements setting forth monetary relief require “disgorgement” without specifically stating that the disgorgement is for improperly obtained funds. (See SEC order ¶ IV [J], 2005 WL 3240598, *14, 2005 SEC LEXIS 3078, *38-40; NYAG discontinuance at 5.) However, as explained by the trial court in Vigilant, the very purpose of disgorgement is “to deprive a party of ill-gotten gains and to deter improper conduct.” (6 Misc 3d 1020[A], 2003 NY Slip Op 51747DJ], *4 [2003], mod on other grounds 10 AD3d 528 [2004]; Securities & Exch. Commn. v Fischbach Corp., 133 F3d 170 [2d Cir 1997].) Moreover, contrary to Millennium’s contention, the settlements conclusively link the disgorgement to improperly acquired funds. The SEC order expressly finds that Millennium engaged in fraudulent activities, in violation of federal securities laws, which allowed it to “generate[ ] tens of millions of dollars in profits through mar *218 ket timing.” (See SEC order ¶ III [9], 2005 WL 3240598, *3, 2005 SEC LEXIS 3078, *7.) It further states that Millennium consented to the entry of the SEC order and that these findings were made pursuant to Millennium’s settlement offers. (See SEC order ¶¶ II, III, n 2, 2005 WL 3240598, *1, *15, n 2, 2005 SEC LEXIS 3078, *2-3, n 2.) The SEC order then concludes with the provision for disgorgement. (SEC order ¶ IV [J], 2005 WL 3240598, *14, 2005 SEC LEXIS 3078, *38-40.) Read as a whole, the settlements are not reasonably susceptible to any other interpretation than that the relief provisions require disgorgement of funds gained through improper market timing activities.
This construction of the settlements is confirmed by a subsequent filing by Millennium with the SEC in which Millennium specifically acknowledged that “[t]he remedies [in the SEC and NYAG settlements] included disgorgement by [Millennium] of approximately $148 million of mutual fund trading profits” as well as civil penalties and other relief. (Schedule 13D, item 2 [e]; exhibit F to Select’s reply.)[2]
To the extent that Millennium further argues that because the settlements were not reduced to a final judgment, there has not been a conclusive adjudication that Millennium’s payment constituted a disgorgement of improperly obtained funds, this argument must be rejected. While the Vigilant settlement did involve a judgment, that judgment was entered by agreement of the parties and contained a statement, like that in the instant settlements, that CSFB was not admitting any wrongdoing. (See Vigilant, 6 Misc 3d 1020[A], 2003 NY Slip Op 51747[U], *4 [2003].) The settlements in the instant case are thus comparable to the Vigilant judgment and “essentially equivalent to a determination, reached through agreement of the parties.” (See Reliance Group Holdings, 188 AD2d at 55.) It is well settled that a court’s determination as to whether a party has wrongfully obtained funds, and therefore as to whether insurance coverage is available for restitution, “should not hinge on the circumstance that [the party] made restitution by way of settlement instead of in satisfaction of a judgment.” (See id.)
*219 Finally, Millennium’s reliance on Vigilant Ins. Co. v Bear Stearns Cos., Inc. (34 AD3d 300 [1st Dept 2006], revd 10 NY3d 170 [2008]) is misplaced. There, in an opinion that was reversed on other grounds, the Appellate Division found the existence of a triable issue of fact as to whether the portion of the defendant’s settlement with the SEC that was attributed to disgorgement “actually represented ill-gotten gains or improperly acquired funds.” (Id. at 302.) The Court expressly noted that the defendant had submitted evidence that the settlement was based on market share instead of being tied to the amount of commissions the defendant had received. (See id. at 303.) Here, in contrast, Millennium did not submit any evidence that the amount to be disgorged was not attributable to profits made as a result of its market timing.
The court has considered plaintiff’s remaining contentions and finds them to be without merit.
Accordingly, it is hereby ordered that defendant Select Insurance Company’s motion for summary judgment is granted to the extent of dismissing the complaint of Millennium Partners, L.P, as against said defendant; and it is further ordered that the remaining claims are severed and shall continue.

. According to the SEC order, market timing involves frequent buying and selling of shares of the same mutual fund or buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing. (See SEC order ¶ III [10], 2005 WL 3240598, *3, 2005 SEC LEXIS 3078, *7-8.) The SEC order noted that market timing is not illegal per se but can dilute the value of other mutual fund shareholders’ shares or disrupt the management of the fund’s portfolio. (See id.) Contrary to Millennium’s contention, the SEC order did not make a novel finding that Millennium had violated the securities laws based on the mere fact that it had engaged in market timing. Rather, the order concluded that the manner in which Millennium had engaged in market timing was “fraudulent.” (SEC order ¶ III [14]-[24], [27]-[28], 2005 WL 3240598, *4-8, 2005 SEC LEXIS 3078, *11-24.)

. While new factual matter is ordinarily not properly considered on a reply (see Ritt v Lenox Hill Hosp., 182 AD2d 560, 562 [1st Dept 1992]), this SEC filing, which Select submitted on its reply, responds to Millennium’s argument in opposition to Select’s motion that an issue of fact exists as to whether the amounts to be disgorged represented improperly obtained funds. The new evidence is therefore properly entertained by this court. (See Anderson v Beth Israel Med. Ctr., 31 AD3d 284 [1st Dept 2006].)