[2 NYS3d 415]

J.P. Morgan Securities Inc. et al., Respondents, v Vigilant Insurance Company et al., Appellants.

First Department, January 15, 2015

## APPEARANCES OF COUNSEL

*DLA Piper LLP*, New York City (*Joseph G. Finnerty III, Megan Shea Harwick* and *Eric S. Connuck* of counsel), for Vigilant Insurance Company and another, appellants.

*Drinker Biddle & Reath LLP*, New York City (*Marsha J. Indych* of counsel), for Travelers Indemnity Company, appellant.

*D'Amato & Lynch LLP*, New York City (*Luke D. Lynch, Jr., Kevin Windels* and *Liza Chafiian* of counsel), for National Union Fire Insurance Company of Pittsburg, Pa., appellant.

*Kaufman Borgeest & Ryan LLP*, New York City (*Scott A. Schechter* and *Sergio Alves* of counsel), for Liberty Mutual Insurance Company, appellant.

*Clyde & Co. US LLP*, New York City (*Edward J. Kirk, Allison M. Calkins* and *James Mirro* of counsel), for Certain Underwriters at Lloyd's London, appellant.

*Landman Corsi Ballaine & Ford P.C.*, New York City (*Michael L. Gioia* of counsel), for American Alternative Insurance Corporation, appellant.

*Proskauer Rose LLP*, New York City (*John H. Gross, Steven E. Obus, Seth B. Schafler, Francis D. Landrey* and *Matthew J. Morris* of counsel), for respondents.

## OPINION OF THE COURT

MAZZARELLI, J.P.

In 2000, defendant Vigilant Insurance Company issued a professional liability insurance policy to plaintiff Bear Stearns, and the other defendants issued "follow-the-form" excess policies, which required them to indemnify Bear Stearns for all losses it became "legally obligated to pay as a result of any Claim . . . for any Wrongful Act" on its part.[1] The policy broadly defined "loss" to include "compensatory damages," "judgments," and "settlements," while "claim" was expressly defined to include investigations by the Securities and Exchange Commission (SEC) and the New York Stock Exchange (NYSE) into "possible violations of law or regulation." The "Dishonest Acts Exclusion" in the policies provided:

> "This policy shall not apply to any Claim(s) made against the Insured(s) . . . based upon or arising out of any deliberate, dishonest, fraudulent or criminal act or omission by such Insured(s), provided, however, such Insured(s) shall be protected under the terms of this policy with respect to any Claim(s) made against them in which it is alleged that such Insured(s) committed any deliberate, dishonest, fraudulent or criminal act or omission, *unless judgment or other final adjudication thereof adverse to such Insured(s) shall establish that such Insured(s) were guilty of any deliberate, dishonest, fraudulent or criminal act or omission*" (emphasis added).

In 2003, the SEC and the NYSE began to investigate Bear Stearns for allegedly facilitating late trading and deceptive market timing by certain of its customers in connection with the buying and selling of shares in mutual funds. Late trading has been defined as

---

1. A fuller discussion of the facts underlying this case may be found in the decisions in prior appeals in this case (*see* 91 AD3d 226 [1st Dept 2011], *revd* 21 NY3d 324 [2013]).

"the practice of placing orders to buy, redeem or exchange mutual fund shares after the 4:00 p.m. close of trading, but receiving the price based on the net asset value set at the close of trading. The practice allows traders to obtain improper profits by using information obtained after the close of trading. Market timing involves the frequent buying and selling of shares of the same mutual fund or the buying or selling of mutual fund shares to exploit inefficiencies in mutual fund pricing. Although market timing is not per se improper, it can be deceptive if it induces a mutual fund to accept trades it otherwise would not accept under its own market timing policies" (*J.P. Morgan Sec. Inc. v Vigilant Ins. Co.*, 21 NY3d 324, 330 n 1 [2013]).

The SEC informed Bear Stearns that it intended to commence civil enforcement proceedings charging Bear Stearns with violations of federal securities laws and seeking injunctive relief and sanctions. After SEC staff reviewed with Bear Stearns the evidence upon which it would rely to support these charges, Bear Stearns decided not to contest the matter but to settle it. Bear Stearns submitted an offer of settlement, which the SEC accepted and incorporated into an "Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order" (the SEC order). Significantly, the SEC order stated:

"Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, [Bear Stearns] consent[s] to the entry of [the SEC order]."

The SEC order included approximately 170 factual "findings" setting forth the malfeasance that the SEC had alleged against Bear Stearns. The "findings" explained, inter alia, how Bear Stearns operated its late trading and market timing scheme in direct disregard of thousands of demands by mutual funds that it stop allowing market timing in their funds; how it took "affirmative steps" to help its clients "evade the blocks and restrictions imposed by the mutual funds"; and how it endeavored to "ensure that [the clients'] rapid mutual fund trades would not

be detected by the mutual funds." The "findings" further outlined Bear Stearns's assignment of "multiple account numbers to customers so that the mutual funds could not identify them as customers whose trades they had previously blocked." However, the SEC order expressly stated, "The findings herein are made pursuant to [Bear Stearns's] Offer of Settlement and are not binding on any other person in this or any other proceeding." The SEC order directed Bear Stearns to disgorge $160,000,000 and pay civil penalties of $90,000,000, as well as to cease and desist from future violations.

Bear Stearns entered into a similar arrangement with the NYSE. Pursuant to the NYSE's rules, the parties agreed on a "Stipulation of Facts and Consent to Penalty" (the NYSE stipulation), which was to be put before a hearing panel. As was the case with the SEC order, the NYSE stipulation contained a litany of detailed "findings" to which Bear Stearns consented, but with the caveat that it was "[f]or the sole purpose of settling this disciplinary proceeding, prior to hearing, without adjudication of any issue of law or fact, and without admitting or denying allegations, facts, conclusions or findings referred to" therein. Bear Stearns agreed in the NYSE stipulation to pay the same sanction it agreed to pay in the SEC order, but the NYSE stipulation deemed the payment satisfied by Bear Stearns's payment of the sanction to the SEC.

Bear Stearns was also named in several shareholder class actions in which investors alleged damages arising out of the illegal trading scheme. In one decision denying Bear Stearns's motions to dismiss these actions the court found that the plaintiffs had sufficiently alleged that Bear Stearns engaged in late trading and market timing (*see In re Mutual Funds Inv. Litig.*, 384 F Supp 2d 845, 862 [D Md 2005]), and that they had adequately pleaded claims that Bear Stearns was a "codesigner[ ]" or "committed a manipulative or deceptive act in furtherance of" the illegal mutual fund trading scheme (*id.* at 858 [internal quotation marks omitted]) and "did not merely assist in facilitating late trades and market timed transactions" (*id.* at 862). However, no finding of liability was ever made because Bear Stearns ultimately agreed to pay $14 million to settle the class actions.

Bear Stearns sought indemnification from defendants for the amounts they paid to settle the two administrative proceedings and the civil actions. Defendants refused to pay, citing, inter alia, the doctrine that disgorgement payments are not insur-

able as a matter of settled New York law and public policy, as well as several exclusions in the policies, including the Dishonest Acts Exclusion. Plaintiffs J.P. Morgan Securities Inc., J.P. Morgan Clearing Corp. and The Bear Stearns Companies LLC (collectively Bear Stearns) commenced this action for a declaratory judgment compelling defendants to provide coverage, and defendants moved to dismiss. Defendants' motion was based on the public policy doctrine and two policy exclusions, but not on the Dishonest Acts Exclusion. Supreme Court denied the motion, finding, as is relevant here, that there was a question whether the payments Bear Stearns had agreed to make were for improperly acquired funds and thus truly were in the nature of disgorgement (2010 NY Slip Op 33799[U] [2010]). This Court reversed, and granted the motion, stating that

> "read as a whole, the offer of settlement, the SEC Order, the NYSE [stipulation] and related documents are not reasonably susceptible to any interpretation other than that Bear Stearns knowingly and intentionally facilitated illegal late trading for preferred customers, and that the relief provisions of the SEC Order required disgorgement of funds gained through that illegal activity" (91 AD3d at 231).

The Court of Appeals reversed, and denied the motion, holding that the language in those documents did not "decisively repudiate Bear Stearns' allegation that the SEC disgorgement payment amount was calculated in large measure on the profits of others," as opposed to a calculation of ill-gotten gains by Bear Stearns (21 NY3d at 336).

While that appeal was pending in this Court, Bear Stearns moved for summary judgment dismissing defendants' defenses based on the Dishonest Acts Exclusion and the public policy doctrine. Defendants cross-moved for summary judgment on the Dishonest Acts Exclusion. After the Court of Appeals had decided the appeal, Supreme Court denied defendants' motion and granted Bear Stearns's motion to dismiss the affirmative defense that the "findings" made in the regulatory administrative orders established that Bear Stearns acted with the intent to injure investors (42 Misc 3d 1230[A], 2014 NY Slip Op 50284[U] [2014]). The court found that the administrative orders did not trigger the Dishonest Acts Exclusion because they were not final judgments or adjudications.

The court relied on the facts that the regulatory factual "findings" were neither admitted nor denied by Bear Stearns and

that the administrative orders were the results of settlements in which Bear Stearns reserved the right to take contrary legal and factual positions in proceedings to which the SEC was not a party. Accordingly, the court dismissed defendants' affirmative defenses based on the Dishonest Acts Exclusion and public policy, to the extent they were premised on the "findings" in the administrative orders. However, citing the Court of Appeals' decision on the prior appeal (21 NY3d at 335, 336), the court ordered that the action would continue "with respect to assessing whether there is evidence demonstrating Bear Stearns 'had the requisite intent to cause harm,' and if the disgorgement payment to the SEC is linked to 'improperly acquired funds,' which would bar insurance coverage on the public policy grounds" (2014 NY Slip Op 50284[U], *6).

Defendants contend that the Dishonest Acts Exclusion applies because, by consenting to the entry of administrative orders that contained detailed "findings" and required Bear Stearns to make compensatory payments and pay penalties, Bear Stearns had been adjudicated a wrongdoer. Defendants stress the incorporation of "findings" in the SEC order and the NYSE stipulation, and contend that the inclusion of these "findings" effectively transformed them from mere allegations to proven fact. Defendants further point to cases that they characterize as equating consent judgments and orders with adjudications (*see e.g. Schwartzreich v E.P.C. Carting Co.*, 246 AD2d 439 [1st Dept 1998]; *Prudential Lines v Firemen's Ins. Co. of Newark, N.J.*, 91 AD2d 1 [1st Dept 1982]). They note provisions in the Administrative Procedure Act, which govern proceedings instituted by the SEC, that refer to enforcement proceedings as "adjudications" (*see e.g.* 5 USC § 551 [7]).

Defendants also place heavy reliance on two cases, *Vigilant Ins. Co. v Credit Suisse First Boston Corp.* (6 Misc 3d 1020[A], 2003 NY Slip Op 51747[U] [Sup Ct, NY County 2003], *mod on other grounds* 10 AD3d 528 [1st Dept 2004]) and *Millennium Partners, L.P. v Select Ins. Co.* (24 Misc 3d 212 [Sup Ct, NY County 2009], *affd* 68 AD3d 420 [1st Dept 2009], *appeal dismissed* 14 NY3d 856 [2010]). In each of those cases, the insurer successfully relied on consent decrees entered into by the insured to avoid having to indemnify the insured for monies it agreed to disgorge as a result of wrongdoing.

Bear Stearns argues that the SEC order, the NYSE stipulation and the resolution of the class action were settlements, and that a settlement can never constitute an adjudication for

purposes of the type of exclusion at issue here. It principally relies on *National Union Fire Ins. Co. of Pittsburgh, Pa. v Xerox Corp.* (25 AD3d 309 [1st Dept 2006], *lv dismissed* 7 NY3d 886 [2006]), in which this Court declined to hold that a consent decree between the SEC and the defendants constituted an "adjudication" for purposes of an insurance policy exclusion similar to the one at issue here, where the insureds reserved the right to contest the allegations against other litigants.

"To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case" (*Westview Assoc. v Guaranty Natl. Ins. Co.*, 95 NY2d 334, 340 [2000], quoting *Continental Cas. Co. v Rapid-American Corp.*, 80 NY2d 640, 652 [1993]). Further, the court is required to interpret the policy "in light of 'common speech' and the reasonable expectations of a businessperson" (*Belt Painting Corp. v TIG Ins. Co.*, 100 NY2d 377, 383 [2003]). Here, the issue is the applicability of the Dishonest Acts Exclusion, so defendants bear the specific burden of demonstrating that a settlement constitutes an "adjudication" for purposes of the exclusion.

 In arguing that the term "adjudication" means any resolution of a dispute that has specific consequences for a party, defendants virtually ignore the part of the Dishonest Acts Exclusion that requires that any adjudication *"establish* that such Insured(s) were guilty of any deliberate, dishonest, fraudulent or criminal act or omission" (emphasis added). Defendants quote the dictionary definition of "adjudication," but fail to note that "establish" is defined, in this context, as "to put beyond doubt" (Merriam-Webster's Collegiate Dictionary [11th ed 2003], establish). It can hardly be said that the SEC order and the NYSE stipulation put Bear Stearns's guilt "beyond doubt," when those very same documents expressly provided that Bear Stearns did not admit guilt, and reserved the right to profess its innocence in unrelated proceedings. Again, in interpreting the policy we are guided by reason, and defendants' position that the settlement documents "establish" guilt is not reasonable.

Moreover, defendants' interpretation is inconsistent with our own recent precedent concerning consent decrees with prosecuting agencies. In *Borst v Bovis Lend Lease LMB, Inc.* (102 AD3d 519 [1st Dept 2013]), the plaintiffs were firefighters who were injured while battling a fire that had ignited during the

deconstruction of the Deutsche Bank building adjacent to the World Trade Center.[2] Two other firefighters had perished in the conflagration. Bovis was the general contractor on the project. A post-fire investigation revealed safety lapses on the deconstruction site that were so serious that the New York County District Attorney's Office determined that there was sufficient evidence to bring charges against Bovis for manslaughter in the second degree, criminally negligent homicide, and reckless endangerment in the second degree.

Instead of prosecuting, however, the District Attorney's Office offered to enter into a non-prosecution agreement with Bovis whereby Bovis would acknowledge responsibility for its actions, agree to comply with various safety initiatives, and establish a memorial fund. Bovis accepted the offer, and in the agreement it provided that it did not challenge certain detailed facts, which were incorporated into the agreement. These facts stated, inter alia, that on the day of the fire Bovis informed responding firefighters that a standpipe was operational even though it knew that it was not, that it had purposefully neglected to take any measures to fix the standpipe in the months prior to the fire, even though it was aware of the critical role it would play in fighting a fire, and that its project manager reported the standpipe as being in working condition on daily project checklists, even though it was not. The agreement also provided that Bovis neither admitted nor denied criminal and civil liability for the fire, and in it Bovis reserved the right to contradict the recitation of facts in any civil litigation or proceeding related to the fire to which the District Attorney's Office was not a party.

The plaintiffs moved for summary judgment on liability, arguing that the non-prosecution agreement was irrefutable evidence that Bovis had admitted its negligence. This Court affirmed Supreme Court's rejection of that position, stating that

> "[t]he agreement explicitly provided that Bovis had not admitted liability, that the factual statements contained in the agreement were relevant only for the purposes of the compromise between the NYDA [the District Attorney's Office] and Bovis, and that Bovis could contradict and/or contest any factual statement in the agreement in a subsequent action

---

2. The facts underlying the *Borst* decision were obtained from the briefs filed in this Court in connection with that appeal.

or proceeding to which the NYDA was not a party" (102 AD3d at 520).

The situation here does not warrant a different result. As Bovis did in *Borst*, Bear Stearns entered into a settlement agreement that was expressly crafted to preserve its ability to contest its liability against any person or entity other than the counter-signatory. Further, while we certainly do not condone the financial machinations outlined in the SEC order and NYSE stipulation, they do not begin to compare to the reckless behavior outlined in the agreement at issue in *Borst*, which led to the deaths of two firefighters and serious injury to several others. To hold that the non-prosecution agreement in that case preserved Bovis's ability to contest its liability but that Bear Stearns is precluded from doing so in this case would be a perverse result, to say the least.

The cases relied upon by defendants are unavailing. To the extent the cases hold that, in general, a settlement can have the same preclusive effect as a judgment on the merits, this is an uncontroversial proposition. However, the issue here is not the preclusive effect of a settlement agreement, which has to do with preservation of judicial resources and basic fairness to litigants. It is the interpretation of a contract.

Defendants rely mainly, as they did before Supreme Court, on *Vigilant Ins. Co. v Credit Suisse First Boston Corp.* (6 Misc 3d 1020[A], 2003 NY Slip Op 51747[U] [Sup Ct, NY County 2003]) and *Millennium Partners, L.P. v Select Ins. Co.* (24 Misc 3d 212 [Sup Ct, NY County 2009]). However, these cases are inapposite. In *Vigilant Ins. Co.*, the plaintiff insured an investment bank, which had settled allegations of financial improprieties leveled by the SEC. The bank agreed to the entry of a "final judgment" that explained that it was disgorging significant monies "obtained improperly by [it] as a result of the conduct alleged in" a complaint filed by the SEC in federal court (2003 NY Slip Op 51747[U], *3). The plaintiff argued that the bank was not entitled to indemnification because public policy prohibits insurance against disgorgement. The bank contended that, because the final judgment stated that it had admitted no wrongdoing, the judgment was inconclusive as to whether payment by plaintiff would contravene public policy. The court rejected this argument, because the final judgment "specifically link[ed] the disgorgement payment to the improper activity that the SEC complaint alleged" (*id.* at *4). This Court affirmed that part of Supreme Court's decision (10 AD3d at 529).

The facts of *Millennium Partners* are similar. Plaintiff was a hedge fund that entered into a settlement with the SEC to resolve allegations of financial malfeasance. It consented to the entry of an order, similar to the one at issue in this case, that incorporated factual "findings" echoing the allegations leveled by the SEC, but contained language explaining that the plaintiff was neither admitting nor denying those allegations. The court followed *Vigilant Ins. Co.* in holding that the plaintiff was not entitled to indemnification, because the SEC order established that the defendant insurers would be reimbursing the plaintiff for monies it was required to disgorge as a result of wrongdoing, in contravention of public policy. This court affirmed.

Although the applicability of a consent decree was at issue in those two cases, their similarity to this case ends there. In those cases the focus was on whether the disgorgement made by the insureds was for wrongdoing that they had committed, so that public policy would bar the insurers from covering the disgorgement. In this case we are strictly concerned with the unrelated issue of whether an exclusion for "adjudicated" wrongdoing applies where the purported "adjudication" is a consent decree or other settlement agreement entered into by the insured, with the caveat that it is not admitting guilt other than for purposes of the settlement.

The case principally relied on by Bear Stearns, *National Union Fire Ins. Co. of Pittsburgh, Pa. v Xerox Corp.* (6 Misc 3d 763 [Sup Ct, NY County 2004]), directly involves the issue before us now. In that case, the defendants were the subject of investigations and enforcement actions by the SEC. They settled the administrative actions by entering into "final judgments" with the SEC that required them to disgorge monies. The judgments each stated that the defendants were neither admitting nor denying the allegations in the complaint, but that the monies being disgorged were gained as a result of the malfeasance detailed in the complaint. The defendants sought indemnification under insurance policies issued by the plaintiff, and the plaintiff sought to avoid coverage by invoking, inter alia, an exclusion for fraudulent conduct where "there is a judgment or final adjudication" alleging same (6 Misc 3d at 770). The court dismissed as premature the plaintiff's cause of action seeking a declaration that the exclusion applied. This was apparently because there were still private litigations pending against the defendants arising out of their actions, so

it was still possible that a future "adjudication" would find that the defendants had engaged in fraudulent behavior. The implication, however, was that the "final judgments" entered into by the defendants were insufficient to trigger the exclusion.

This Court, in affirming, did not directly address the exclusion. However, in affirming the dismissal of the insurer's claims for a declaration that Xerox fraudulently induced the insurer into issuing the policy, this Court rejected the insurer's attempt to use the consent judgment against Xerox as a sword, stating, in relevant part:

> "In their respective settlements with the [SEC], defendants did not admit guilt, and the consent agreements specifically precluded any collateral estoppel effect and did not preclude defendants from taking positions contrary to the settlements in any litigation in which the SEC was not a party. Thus, defendants did not admit the falsity of their financial statements for purposes of this litigation or any claim which might be brought regarding those financial statements" (25 AD3d at 309-310).

We reject defendants' attempts to distinguish *Xerox*. That the "final judgment" in that case contained no recitation of facts is of no moment, since, as discussed above, Xerox's reservation of its right to later contest the charges in the SEC's complaint would preclude the characterization of any such recitation as conclusive "findings." Further, although this Court's affirmance in *Xerox* did not directly address the exclusion in that case, the holding, that a consent decree that expressly leaves open the question of guilt cannot be used to establish guilt, applies to the Dishonest Acts Exclusion at issue here.

To be clear, *Xerox*, on the one hand, and *Vigilant Ins. Co.* and *Millennium Partners*, on the other, can be reconciled. We do not find it contradictory to rely on a settlement agreement for the limited purpose of establishing whether a payment constituted disgorgement, even if the insured did not admit guilt, but not for the purpose of determining whether the agreement was an adjudication that established guilt for the purpose of satisfying an exclusion. This is because, as the Court of Appeals noted in the prior appeal in this case (21 NY3d at 334), we have a stronger interest in enforcing public policy than we have in regulating private dealings between insurance companies and their customers that do not have an impact on public

policy. It is not the business of the courts to prevent financial firms and their regulators from agreeing to submit language in consent orders that preserves claims of innocence for the purpose of avoiding exclusions like the one at issue here. At the same time, however, courts should not countenance the use of such language for the purpose of preserving coverage for wrongful acts intended to harm others.

■ Because the Dishonest Acts Exclusion does not apply, the motion court properly dismissed defendants' affirmative defense based on that exclusion. However, the court should not have dismissed the affirmative defense invoking the public policy against permitting insurance coverage for disgorgement, to the extent it is based on the settlements with the SEC and the NYSE. Bear Stearns argues that the absence of an adjudication of wrongdoing within the meaning of the Dishonest Acts Exclusion bars defendants from relying on the "findings" in the settlement orders for purposes of the public policy doctrine. Again, however, as the Court of Appeals stated in the prior appeal, one of the two situations in which the contractual language of a policy may be overwritten is where an insured engages in conduct "with the intent to cause injury" (21 NY3d at 334-335 [internal quotation marks omitted]). This is the very reason we can reconcile finding for the insurer in *Vigilant Ins. Co.* and *Millennium Partners*, where the insureds admitted to the recitation of "findings" while not conceding their guilt, with *Xerox*, where the public policy doctrine was not at issue so the use of the term "adjudication" in the insurance contract was determinative. Indeed, for us to accept Bear Stearns's argument on this point would be to contradict the holdings in *Vigilant Ins. Co.* and *Millennium Partners*.

Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered February 28, 2014, which denied defendants' motion for partial summary judgment, and granted plaintiffs' motion for partial summary judgment dismissing the affirmative defenses based on (1) the exclusion for deliberate, dishonest, fraudulent or criminal acts or omissions (the Dishonest Acts Exclusion) and (2) the doctrine precluding, on public policy grounds, insurance coverage for monies paid by the insured as a result of intentional harm to others, should be modified, on the law, to deny plaintiffs' motion as to the affirmative defense based on public policy, and otherwise affirmed, without costs.

Acosta, Saxe, Richter and Clark, JJ., concur.

Order, Supreme Court, New York County, entered February 28, 2014, modified, on the law, to deny plaintiffs' motion as to the affirmative defense based on public policy, and otherwise affirmed, without costs.